**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JEANNIE K. MAY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case number 4:14cv0578 TCM** |
| | ) | |
| **NATIONSTAR MORTGAGE, LLC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM AND ORDER**

This matter is before the Court[1] on motions filed by Nationstar Mortgage, LLC ("Defendant") to dismiss, under Federal Rule of Civil Procedure 12(b)(6), Counts II, IV, V, VI, and IX of the second amended complaint filed by Jeannie K. May ("Plaintiff") [Docs. 18 and 58]. Plaintiff concedes that the claim in Count VI is moot and otherwise opposes the motions.

Plaintiff challenges Defendant's handling of a loan Plaintiff originally obtained from a different entity in 2007 to purchase her residence. After Plaintiff filed this action in state court, Defendant removed the lawsuit to this Court on the grounds that Plaintiff alleged, in her then-pending first amended petition, violations of federal statutes, which claims fall within this Court's federal question jurisdiction, 28 U.S.C. § 1331, and pursued related state law claims, over which this Court may exercise supplemental jurisdiction under 28 U.S.C. § 1367(a). Now before the Court is Plaintiff's ten-count second amended complaint, and

---

[1] The case is before the undersigned United States Magistrate Judge by written consent of the parties. <u>See</u> 28 U.S.C. § 636(c).

Defendant's motions to dismiss five of the six state law claims in that complaint. In particular, Defendant moves for dismissal of the two claims that Defendant's challenged actions violated the Missouri Merchandising Practices Act ("MMPA"), Mo. Rev. Stat. §§ 407.010 et seq. (Counts II and IX), and seeks dismissal of the claims that Defendant is liable for slander of title (Count IV), invasion of privacy (Count V), and wrongful foreclosure (Count VI). The motions to dismiss do not challenge either Plaintiff's sixth state law claim for Defendant's alleged breach of contract (Count VII) or any of Plaintiff's four claims that Defendant's challenged conduct violates several federal statutes.

## Discussion

Rule 12(b)(6) Standard. A motion filed under Federal Rule of Civil Procedure 12(b)(6) requests dismissal for "failure to state a claim upon which relief can be granted." When resolving such a motion, the court must take as true the alleged facts and determine whether they are sufficient to raise more than a speculative right to relief. **Bell Atl. Corp. v. Twombly**, 550 U.S. 544, 555-56 (2007); accord **Hager v. Arkansas Dep't of Health**, 735 F.3d 1009, 1013 (8th Cir. 2013) (under Rule 12(b)(6), "the factual allegations in the complaint are accepted as true and viewed most favorably to the plaintiff"). The court does not, however, accept as true any allegation that is a legal conclusion. **Ashcroft v. Iqbal**, 556 U.S. 662, 678 (2009); accord **Hager**, 735 F.3d at 1013 ("[c]ourts must not presume the truth of legal conclusions couched as factual allegations," citing Papasan v. Allain, 478 U.S. 265, 286 (1986)).

A complaint must have "'a short and plain statement of the claim showing that the

- 2 -

[plaintiff] is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" **Twombly**, 550 U.S. at 555 (quoting Fed. R. Civ. P. 8(a)(2) and then <u>Conley v. Gibson</u>, 355 U.S. 41, 47 (1957), <u>abrogated by Twombly</u>, <u>supra</u>); <u>see</u> <u>also</u> **Gregory v. Dillard's Inc.**, 565 F.3d 464, 473 (8th Cir. 2009) (en banc).  While detailed factual allegations are not necessary, a complaint that contains "labels and conclusions," and "a formulaic recitation of the elements of a cause of action" is not sufficient. **Twombly**, 550 U.S. at 555; <u>accord</u> **Iqbal**, 556 U.S. at 678.

The complaint must set forth "enough facts to state a claim to relief that is plausible on its face." **Twombly**, 550 U.S. at 570; <u>accord</u> **Iqbal**, 556 U.S. at 678; **Braden v. Wal-Mart Stores, Inc.**, 588 F.3d 585, 594 (8th Cir. 2009).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." **Iqbal**, 556 U.S. at 678.  "[T]he complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." **Braden**, 588 F.3d at 594.  If the claims are only conceivable, not plausible, the complaint must be dismissed under Rule 12(b)(6). **Twombly**, 550 U.S. at 570; <u>accord</u> **Iqbal**, 556 U.S. at 679.

With respect to Plaintiff's state claims, this Court applies Missouri law to ascertain the elements of  those claims. <u>See</u> **Walker v. Barrett**, 650 F.3d 1198, 1203 (8th Cir. 2011) (Missouri law applies to state claims pursued under the federal court's supplemental jurisdiction).  "When construing Missouri law, '[this Court is] bound by the decisions of the

Missouri Supreme Court regarding issues of substantive state law.' Bockelman v. MCI Worldcom, Inc., 403 F.3d 528, 531 (8th Cir. 2005)." **Id.** Absent decisions of the Missouri Supreme Court, this Court considers "opinions from the Missouri Court of Appeals as 'particularly relevant' and must follow them when those opinions provide 'the best evidence of Missouri law.' [Bockelman, 403 F.3d at 531] (quotations and citations omitted)." **Id.**

Importantly, a court considering a Rule 12(b)(6) motion to dismiss "is not limited to the allegations in the complaint, but may also consider 'materials that do not contradict the complaint, or materials that are necessarily embraced by the pleadings.' Noble Sys. Corp. v. Alorica Cent., LLC, 543 F.3d 978, 982 (8th Cir. 2008)." **Smithrud v. City of St. Paul, Minn.,** 746 F.3d 391, 397 (8th Cir.), cert. denied, 135 S. Ct. 361 (2014). Here, Plaintiff provided forty-one exhibits with her first amended petition, which was filed upon removal of this case from state court. The second amended complaint contains references to those exhibits.[2] Because those materials are "necessarily embraced" by the second amended complaint, the Court may consider those exhibits in resolving the pending motions to dismiss.

Defendant provided as exhibits to its second motion to dismiss a copy of the note and a copy of the deed of trust pertaining to Plaintiff's purchase of her home. While these

---

[2] The forty-one exhibits were not filed again with the second amended complaint, which had no exhibits attached to it. (See Exhibits attached to First Amended Petition [Doc. 7] and Second Amended Complaint [Doc. 56].) Those forty-one exhibits support the allegations in the first amended petition as well as the same allegations in the second amended complaint.

One of the exhibits, Exhibit CC (see ¶ 51 of the Second Am. Compl. [Doc. 56]), was not marked as Exhibit CC or filed separately (see Doc. 7 attachments), but was submitted as the third and fourth page of the material submitted as Exhibit BB [Doc. 7-28].

materials were not provided as part of or with either the first amended petition or the second amended complaint, the deed of trust may be considered a public record in that it was filed with the St. Louis County Recorder of Deeds office. In **Noble Sys. Corp.**, the United States Court of Appeals for the Eighth Circuit stated that "[w]hen ruling . . . a motion to dismiss under Rule[] 12(b)(6) . . . , a district court . . . may . . . consider some public records." **Noble Sys. Corp.**, 543 F.3d at 982 (finding a financing statement that was "on file with the state of Minnesota" was "a public record that can be considered" in resolving a Rule 12(b)(6) motion "even if not mentioned expressly in the pleadings"). Under the circumstances, because the deed of trust is a public record and because both the note and the deed of trust are "necessarily embraced" by the allegations in the second amended complaint, the Court may consider those documents to resolve the issues presented by Defendant's motions to dismiss.

Based on the standard applicable to the consideration of Rule 12(b)(6) motions, the factual allegations in the second amended complaint, taken as true, reveal in relevant part that Jeannie K. May ("Plaintiff"), a single person, purchased her home in St. Louis County, Missouri, in May 2007, with a $100,000 loan financed by Cornerstone Mortgage, Inc. (Pl. Second Am. Compl. ¶¶ 1, 4, 8, 9.) After the closing, the servicing of the loan was transferred to CitiMortgage and then, in November 2010, to Defendant. (Id. ¶¶ 5, 10, 19.) Plaintiff alleges that the transfer to Defendant was subject to a contract, specifically, a pooling and servicing agreement ("PSA"), that set forth Defendant's duties and responsibilities in servicing Plaintiff's note and mortgage. (Id. ¶¶ 11, 12.)

Plaintiff began having financial difficulties in 2007, fell behind in her mortgage

payments, and filed on November 7, 2007, a voluntary petition for relief under Chapter 13 of the United States Bankruptcy Code ("Bankruptcy Proceeding"). (Id. ¶¶ 14, 15.) CitiMortgage filed in the Bankruptcy Proceeding a proof of claim, including a claim for $1,709.70 in pre-petition charges. (Id. ¶ 18.) The Chapter 13 Plan ("Plan"), which was confirmed by the Bankruptcy Court Judge, required in relevant part both Plaintiff's payment to the Bankruptcy Trustee of at least $395.00 per month for sixty months, as well as Plaintiff's monthly payment of $833.93 to CitiMortgage, Inc. (and then Defendant) for the loan on her home. (Id. ¶¶ 16, 17; see also Ex. B [Doc. 7-2].)

In April 2011, Defendant filed a motion for relief from the bankruptcy stay unless Plaintiff paid a total of $4,838.38 for five post-petition mortgage payments she had reportedly not made. (Pl. Second Am. Compl. ¶ 20 [Doc. 56].) Plaintiff then tendered, and Defendant negotiated, a cashier's check in that amount; and Defendant withdrew its motion for relief from the bankruptcy stay. (Id. ¶¶ 21, 22.) Defendant did not file in Plaintiff's bankruptcy proceeding any notice or demand for payment of any other amount or fee. (Id. ¶ 23.)

On November 15, 2012, the Bankruptcy Trustee filed a notice under Bankruptcy Rule 3002.1(f) reporting that the full amount of the pre-petition default amount of $1,709.70 claimed by Defendant and its predecessor, CitiMortgage, had been paid by the Trustee, and that all post-petition monthly payments had been made by Plaintiff. (Id. ¶ 24.) In its response to that notice, Defendant "admitted that [Plaintiff] had paid" in full the pre-petition amount due of $1,790.70, as well as "all post-petition amounts due to Defendant . . . as of the date of the Trustee's . . . notice." (Id. ¶ 25.)

Plaintiff made timely payments of $859.38 to Defendant in December 2012, January 2013, and February 2013. (Id. ¶ 27.) During this time, customer service representatives for Defendant orally confirmed for Plaintiff that she was current on her mortgage. (Id. ¶ 28; see also ¶ 30.) On March 8, 2013, April 8, 2013, May 7, 2013, June 14, 2013, July 12, 2013, and August 13, 2013, Plaintiff tendered her mortgage payments to Defendant, in the amounts of $859.38 in March and April, and $999.45 in May, June, July, and August. (Id. ¶¶ 34, 39, 48, 52, 54, and 56.)

In a late February 2013 statement from Defendant regarding Plaintiff's March 2013 mortgage obligation, Plaintiff was advised for the first time that she owed Defendant $2,097.20, in addition to her monthly payment of $859.38, for "unpaid late charges, and lender paid expenses which included legal fees and property inspections." (Id. ¶ 29.) She contacted Defendant's customer service department and unsuccessfully "attempted to explain that [Defendant] was mistaken." (Id. ¶ 30.) Plaintiff subsequently received other similar notices, dated March 11, 2013 and April 18, 2013, reporting that she owed Defendant amounts beyond Plaintiff's regular monthly payment amount. (Id. ¶ 36, 43.) The April 18, 2013 notice reported that she had a past due amount totaling $4,296.90 and unpaid late charges of $919.80. (Id. ¶ 43.)

Plaintiff also received from Defendant a "Suspense Notice," dated February 28, 2013, indicating that "unapplied funds" had been placed in a "suspense account which is used for situations where[] funds 'are insufficient to be applied as a full payment.'" (Id. ¶ 31.) She received five more "Suspense Notices," dated March 29, 2013, April 1, 2013, May 9, 2013,

June 18, 2013, and July 16, 2013.  (Id. ¶¶ 37, 38, 50, 53, 55.)

Additionally, Plaintiff began receiving "collection calls from [Defendant's] representatives . . . regarding her 'delinquency'"; and Plaintiff responded that she did not owe a delinquency.  (Id. ¶¶ 32, 42; see also ¶47.)  On March 6, 2013, April 8, 2013, and April 25, 2013, Defendant called Plaintiff "at work to determine when she would be paying [the] alleged arrearage . . . . claim[ing] . . . that she was five months behind and had not made a payment since September 2012."  (Id. ¶¶ 33, 40, 46.)  The calls she received at work upset Plaintiff, and embarrassed her to the extent "her coworkers and manager [could] hear her trying to explain that she was not behind on her mortgage."  (Id. ¶¶ 33, 40, 46.)  During the April 2013 calls, Plaintiff asked Defendant not to "contact her again regarding their mistake." (Id. ¶¶ 40, 46.)  Plaintiff also asked Defendant "to call her cell phone after 4:00 PM when she was at home."  (Id. ¶ 46.)  Defendant continued calling Plaintiff on her cell and work telephones until the end of October 2013.  (Id. ¶ 48.)

Plaintiff received from Defendant an Escrow Disclosure Statement analysis, dated March 8, 2013, reporting that, beginning on May 1, 2013, her monthly payment would increase to $999.45 to cover an alleged escrow shortage and deficiency of $923.41.  (Id. ¶ 35.) Plaintiff paid the increased amount after April 2013.  (Id. ¶¶ 48, 52, 54, and 56.)

In her effort to correct the situation with Defendant, Plaintiff contacted Defendant on several occasions, and sent Defendant three faxes in April 2013.  (Id. ¶ 41; see also ¶ 42.) During a phone conversation on April 23, 2013, Defendant's representative advised Plaintiff that she would get a written response to her fax within ten days; and, in a conversation on

April 30, 2013, advised Plaintiff that "research" would provide a written response.   (<u>Id.</u> ¶¶ 45, 47.)

By letter dated April 19, 2013, Defendant notified Plaintiff that Defendant declared her to be in default under the terms and conditions of her note and deed of trust.  (<u>Id.</u> ¶ 44.)  In that letter, Defendant advised Plaintiff that, as of that date, Defendant was seeking to collect a debt totaling $6,284.33, "which includes the sum of payments that have come due on and after the date of default 12/01/2012," and the amount may be greater on the date of payment.  (<u>Id.</u>; <u>see</u> <u>also</u> Ex. Y [Doc. 7-25].)

In May and June 2013, Defendant offered Plaintiff a Trial Modification Plan for her loan, which Plaintiff did not accept.  (Pl. Second Am. Compl. ¶¶ 49, 51.)

On August 21, 2013, Plaintiff sent Defendant correspondence requesting an explanation of how her account went from being current in November 2012 to being over $6,000.00 in arrears ten months later, even though during that time period Plaintiff had made every monthly payment due.  (<u>Id.</u> ¶ 57.)  By letter, dated September 3, 2013, Defendant responded to Plaintiff's inquiry and included copies of the note, the deed of trust, and an alleged payment history.[3]  (<u>Id.</u> ¶ 59.)

By letter, dated August 30, 2013, Defendant advised Plaintiff that Defendant declared her to be in default and she had until October 4, 2013, to pay $6,013.28 "to bring the account out of default."  (<u>Id.</u> ¶ 58.)

_____

[3] The enclosures reportedly sent with the September 3, 2013 letter are not part of the copy of that letter, Ex. KK, filed in this case.  (<u>See</u> Doc. 7-36.)

The $999.45 mortgage payments Plaintiff tendered in September 2013, October 2013, and November 2013 were rejected by Defendant and returned to her.  (Id. ¶ 60.)

Plaintiff received notification in November 2013 that a law firm ("Law Firm") had been retained by Defendant "to act as Trustee to foreclose on her home." (Id. ¶ 61.)  Plaintiff's attorney contacted the Law Firm in December 2013 disputing any default and asserting neither Defendant nor the Law Firm had a right to proceed with a foreclosure.  (Id. ¶ 62.)  The Law Firm's response, dated December 30, 2013, included a copy of the note and deed of trust, as well as "another pay history for the account."[4]  (Id. ¶ 63.)

Plaintiff tendered her $999.45 monthly mortgage payments in December 2013, January 2014, and February 2014.  (Id. ¶ 65.)

In January 2014, Plaintiff received notice that her home was the subject of a foreclosure sale scheduled for February 24, 2014.  (Id. ¶ 66.)  There is no dispute that the foreclosure sale was subsequently cancelled.  (See, e.g., id. ¶ 3.)

By letter dated March 3, 2014, Defendant returned Plaintiff's $999.45 monthly mortgage payment as "insufficient to bring the account current and alleged that [her] account was $11,965.58 in arrears." (Id. ¶ 131.)

On March 10, 2014, Plaintiff mailed Defendant two letters in which she identified her name, address, social security number, and account number; asked Defendant to correct her account balance based on enclosed evidence that her account was "current by the completion

---

[4]   The enclosures reportedly sent with the December 30, 2013 letter are not part of the copy of that letter, Ex. NN, filed in this case.  (See Doc. 7-39.)

of her bankruptcy plan"; and asked for explanations for the increase in her monthly payment amount to $1,005.72, for Defendant's failure to apply her monthly payments to her account, for Defendant's rejection of those payments, for the information in her "escrow account disclosure statement," and for the reported "past due balance." (Id. ¶ 132.)

By letter dated April 4, 2014, Plaintiff's bank notified her that Defendant had returned her $1,005.72 payment, dated March 25, 2014. (Id. ¶ 135.) On April 28, 2014, Defendant "confirmed an electronic payment in the amount of $1,005.72." (Id. ¶ 137.)

Defendant acknowledged receipt of Plaintiff's March 10, 2014 "Qualified Written Request" ("QWR"); and sought additional time to respond to it. (Id. ¶¶ 134, 136.) In a letter dated May 8, 2014, Defendant stated that it had corrected the error "complained of in the QWR, acknowledged her payment amount is $907.05, . . . claimed that the account was 'approximately' eight payments delinquent with the next payment due for October 1, 2013," and "included an incomprehensible 'Payment History Transaction Report' without further explanation." (Id. ¶ 139; see also ¶ 149.) Through a letter, dated May 24, 2014, Plaintiff acknowledged receipt of Defendant's May 8, 2014, letter and

> asked for an explanation of the increase in her payments from $859.38 per month to $907.05 per month when the note is on a fixed interest rate, her homeowners['] insurance premium had only increased by a total of $41.00 and her property taxes had decreased by a total of $98.67; requested copies of current and corrected escrow analysis; pointed out that [Defendant] had rejected exactly eight payments and now complained that her account was eight months behind; and sought correction of her interest statements for 2012 and 2013.

(Id. ¶¶ 141, 142.)

On May 30, 2014, Defendant processed two payments, one in the amount of $907.05,

and one in the amount of $7,256.40, for a total of "$8,162.45" [sic - $8,163.45] or "nine months of payments at $907.05 . . . [which] should have brought the account current." (Id. ¶ 144.)

In a letter dated June 2, 2014, Defendant acknowledged receipt of the May 24, 2014 letter, and advised Plaintiff that her account "was now 9 months behind." (Id. ¶ 145.)

By a letter dated June 28, 2014, Plaintiff's bank informed her that Defendant had rejected her June payment of $907.05. (Id. ¶ 146.)

On June 29, 2014, Plaintiff sent Equifax a certified letter to dispute "credit reporting by [Defendant] in a credit report dated January 27, 2014 regarding her mortgage including reports of delinquency in payment between March 2013 and October 2013." (Id. ¶ 147.) By letter dated July 25, 2014, "Equifax notified Plaintiff that it had researched the account, that historical account information was deleted, and [Defendant] had provided additional information regarding the account." (Id. ¶ 154.)

On July 29, 2014, Plaintiff's bank advised her that Defendant had rejected her July 2014 payment in the amount $907.05, telling the bank that her "account was closed." (Id. ¶ 155.) Plaintiff's bank temporarily "discontinued her ability to make payments electronically" and Defendant has blocked Plaintiff "from electronic access to her mortgage account and is not sending monthly statements." (Id. ¶¶ 157, 158.)

By a credit report Plaintiff obtained on August 19, 2014, Plaintiff learned that

as of July 24, 2014, [Defendant] and Equifax continued to report Plaintiff's Mortgage as a "collection account" with a past due balance [of] $1,664.00, an outstanding balance of $91,944.00, a last payment date of April 2014, and as

past due between 30 and 180 days from June of 2012 to March of 2014.

(Id. ¶ 159.)    Plaintiff has been denied credit due to Defendant's failure to investigate her dispute.  (Id. ¶ 160.)

Plaintiff's second amended complaint seeks monetary and equitable relief based on six state law claims and four claims of federal statutory violations.  By its pending motions, Defendant seeks dismissal of the MMPA claims in Counts II and IX, as well as the slander of title, invasion of privacy, and wrongful foreclosure claims in Counts IV, V, and VI, respectively, of the second amended complaint.  The Court will address the two MMPA claims before addressing the other challenged state law claims.

Violations of the MMPA (Counts II and IX).  For both of her MMPA claims, Plaintiff alleges that Defendant has serviced the loan since November 1, 2010, and that its actions in collecting payments, calculating interest, and providing Plaintiff with customer support qualify as "services" under the MMPA for which Defendant received payment through a portion of Plaintiff's monthly payments.  (Id. ¶¶ 79-82, 168-71.)

In Count II, Plaintiff alleges that Defendant violated the MMPA by engaging in unfair, deceptive, and misleading practices in connection with servicing the mortgage on Plaintiff's home, including:

a. Refusing to abide by its own admission filed under oath at the close of [Plaintiff]'s bankruptcy case in November of 2012 and [refusing to] treat [Plaintiff]'s account as current beginning in February of 2013 and continuing to the present time;

b.  Declaring expenses which had already been paid as not paid and treating them as delinquencies for the purpose of declaring that the account was in

default when it was not in default;

    c.  Attempting to collect expenses which were allegedly incurred during the course of [Plaintiff]'s Chapter 13 Bankruptcy [Proceeding] which were never disclosed in the Bankruptcy [Proceeding] as required by the Bankruptcy Rules and which were not sanctioned by the bankruptcy court for the purpose of declaring that the account was in default when it was not in default; and

    d.  Wrongfully foreclosing on [Plaintiff]'s home.

(Id. ¶ 88.)   For losses resulting from this conduct, Plaintiff seeks an award of more than $25,000.00 in actual, compensatory, and punitive damages, as well as attorney's fees. (Id. ¶¶ 89 and 90, as well as the ¶ starting with "Wherefore.")

For the MMPA claim in Count IX, Plaintiff alleges that Defendant violated the MMPA by engaging in unfair, deceptive, and misleading practices in connection with servicing the mortgage on Plaintiff's home, including:

    a. Refusing to abide by its own admission filed under oath at the close of [Plaintiff]'s bankruptcy case in November of 2012 and [refusing to] treat [Plaintiff]'s account as current beginning in February of 2013 and continuing to the present time; and

    b.  Wrongfully rejecting payments properly made under the note and deed of trust.

(Id. ¶ 177.)   For losses resulting from this conduct, Plaintiff seeks an award of more than $75,000.00 in actual, compensatory, and punitive damages, as well as attorney's fees. (Id. ¶¶ 178 and 179 as well as the ¶ staring with "Wherefore.")

Defendant moves to dismiss these two MMPA claims on the grounds the challenged conduct, which occurred after the conclusion of the Bankruptcy Proceeding and five years after the original loan transaction, did not occur "in connection with the sale" of

"merchandise," or the original loan transaction, as required by the MMPA. Plaintiff counters that the allegations regarding the violations of the MMPA state claims for relief because they focus on Defendant's conduct in servicing the original loan.

In relevant part, the MMPA provides that any person who purchases[5] or leases merchandise primarily for personal, family, or household purposes and

> "suffers an ascertainable loss of money or property" as the result of an unlawful practice may file a civil lawsuit to recover actual and punitive damages, [equitable relief, and] attorney fees, from any person who has engaged in a method, act or practice declared unlawful by [Mo. Rev. Stat. §] 407.020. [Mo. Rev. Stat. §] 407.025.1.

**Huch v. Charter Commc'ns, Inc.**, 290 S.W.3d 721, 725 (Mo. 2009) (en banc). More specifically, § 407.020.1 declares that

> The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce . . . in or from the state of Missouri, is declared to be an unlawful practice. . . . Any act, use or employment declared unlawful by this subsection violates this subsection whether committed before, during or after the sale, advertisement or solicitation.

The Missouri Supreme Court has interpreted the "plain and ordinary meaning" of the MMPA's "unrestricted, all-encompassing and exceedingly broad" prohibition against an "unfair practice" as "cover[ing] every practice imaginable and every unfairness to whatever degree."

---

[5] Although the MMPA does not define "purchase," the Missouri Court of Appeals for the Eastern District has noted in discussing an MMPA claim that it "is defined in Webster's dictionary as meaning 'to obtain by paying money or its equivalent.'" **Raster v. Ameristar Casinos, Inc.**, 280 S.W.3d 120, 128 (Mo. Ct. App. 2009) (citing Jackson v. Charlie's Chevrolet, Inc., 664 S.W.2d 675, 677 (Mo. Ct. App. 1984)).

**Ports Petroleum Co. v. Nixon**, 37 S.W.3d  237, 240 (Mo 2001) (en banc).  The MMPA defines "[s]ale" as "<u>any sale</u>, lease, offer for sale or lease, or attempt to sell or lease merchandise for cash or <u>on credit</u>"; defines "[m]erchandise" to include "intangibles, <u>real estate or services</u>"; and defines "[t]rade" or "commerce" as "the advertising, offering for sale, sale, or distribution, or any combination thereof, <u>of any services and any property</u>, tangible or intangible, real, personal, or mixed, and any other article, commodity, or thing of value wherever situated" that "directly or indirectly affects the people of this state."  Mo. Rev. Stat. §§ 407.010(4), 407.010(6), and 407.010(7) (emphases added).

To state a claim for violating the MMPA, a litigant must allege that the litigant (1) purchased or leased merchandise to be used primarily "(2) for personal, family, or household purposes, and (3) suffered an ascertainable loss of money or property as a result of" the defendant's alleged conduct that is declared unlawful by Mo. Rev. Stat. § 407.020.  **Ward v. West Cnty. Motor Co.**, 403 S.W.3d 82, 84 (Mo. 2013) (en banc).  Additionally, the litigant seeking relief under the MMPA must allege a relationship between the challenged conduct and the purchased or leased merchandise.  **Conway v. CitiMortgage, Inc.**, 438 S.W.3d 410, 415 (Mo. 2014) (en banc) ([Doc. 29-1 at 3-13].)

In its first motion to dismiss, Defendant argues that the MMPA claim in Count II should be dismissed because Plaintiff does not allege that Defendant engaged in any unfair, deceptive or misleading practice "in connection with" Plaintiff's 2007 transaction by which she obtained the original loan, the transaction that, Defendant urges, constituted a sale of merchandise in trade or commerce for purposes of the MMPA.  Defendant contends that

Plaintiff's allegations instead focus on Defendant's loan servicing conduct since November 2012, which conduct was "not incident to the 2007 consumer sales transaction or purchase of real estate or merchandise," but occurred more than five years later.

After Defendant filed that motion to dismiss, and before Defendant filed the motion to dismiss challenging the MMPA claim in Count IX, the Missouri Supreme Court issued an opinion in each of two cases that presented MMPA challenges to loan servicers' conduct: **Conway**, supra, and **Watson v. Wells Fargo Home Mortg., Inc.**, 438 S.W.3d 404 (Mo. 2014) (en banc) [Doc. 29-1 at 14-24].

In **Conway**, supra, the homeowner plaintiffs alleged the defendants, the assignee of the mortgage loan and the loan servicer, had violated the MMPA by wrongfully foreclosing on a deed of trust. **Conway**, 438 S.W.3d at 412. The defendants moved to dismiss for failure to state a claim, arguing that the allegedly wrongful foreclosure did not occur "in connection with" the sale of merchandise, the original loan, as required by the MMPA. **Id.** at 412, 413. The trial court granted the motion after concluding the defendants were not parties to the original loan transaction and the MMPA "did not apply to post-sale activities that were unrelated to claims or representations made before or at the time of the transaction." **Id.** at 412; see also **id.** at 413.

The Missouri Supreme Court considered the plain and ordinary meaning of the statutory phrase "in connection with" and the MMPA's purpose, and reversed. **Conway**, supra. Noting that the dictionary did not define the full phrase "in connection with," the state supreme court looked to the definition of "to connect" as "to have a relationship" and held that

Mo. Rev. Stat. § 407.020.1 "prohibits the use of the enumerated deceptive practices if there is a relationship between the sale of merchandise and the alleged unlawful action[, which a]ccording to the statute, . . . may occur at any time before, during or after the sale and by any person." **Id.** at 414. Therefore, the state supreme court stated, the plaintiffs needed to allege, in relevant part, a relationship between the challenged foreclosure actions and the original loan in order to avoid dismissal for failure to state a claim. **Id.** at 415.

The Missouri Supreme Court found that, under the circumstances, the allegations stated an MMPA claim. **Id.** at 416-17. First, the loan and the parties' obligations under the loan lasted a period of time beyond the initial transaction.

> For the purposes of the MMPA, a loan is an agreed upon bundle of services being "sold" by the lender to the borrower, and the "sale" of a loan lasts until the last service is performed or the loan is repaid. Accordingly, allegations of fraud and deception in the course of those services are "in connection with" the "sale," as required by section 407.020.1. This is true even where, as here, the party committing the alleged fraud or deception is not the seller. As long as the plaintiff alleges that the misconduct occurred in connection with the services that comprise the "sale" of a loan, the actor can be liable under the MMPA.

**Id.** at 412; see also **id.** at 415 ("[a] loan is composed of both the initial extension of credit and the bundle of related services. It creates a long-term relationship in which the borrower and the lender continue to perform various duties, such as making and collecting payments over an extended period of time. Because each party must continue to perform these duties for the life of the loan, the sale continues throughout the time the parties perform their duties. A party's right to collect a loan is part of that sale and is, therefore, 'in connection with' the loan").

Next, the Missouri Supreme Court concluded that, "[g]iven that the MMPA was enacted to supplement the common law definition of fraud, there is no compelling reason to interpret 'in connection with' to apply only when the entity engaged in the misconduct was a party to the transaction at the time the transaction was initiated." **Id.** at 415.

> Even if the loan servicer was not an original party when the lender and borrower agreed to the services and responsibilities each would perform, enforcing the terms of the loan is in connection with the ongoing sale of the loan . . . . Because a loan is an ongoing transaction, loan collection procedures, whether initiated by a loan originator or a loan servicer, are done "in connection with" the original procurement of the loan.

**Id.** at 415-16; **id.** at 416 ("[g]iven the potentially broad scope of what is prohibited under the MMPA, it would seem incongruous to limit 'in connection with' to only apply to the original parties in a transaction"). Under the circumstances, the plaintiffs had stated a claim under the MMPA because the defendants' "alleged [loan collection] actions were 'in connection with' the [original] loan." **Id.** at 416-17.

In **Watson**, supra, the plaintiff sought relief under the MMPA based on allegations that the defendant loan servicer had both "engaged in bad faith negotiations of a loan modification and wrongfully foreclosed on a deed of trust." **Watson**, 438 S.W.3d at 405, 406-07. "The deed of trust executed in the original transaction specifically stated that there was no obligation to engage in renegotiations." **Id.** at 408; see also **id.** at 406. The trial court granted the defendant's motion for summary judgment, after finding that the defendant, who was not a party to the original loan, was not alleged to have engaged in conduct that was "'in connection with' the sale of the original loan." **Id**. at 406. With respect to the wrongful

foreclosure claim, the Missouri Supreme Court reversed the entry of summary judgment, on the basis of its decision in **Conway**.  **Id.** at 407-08.

As to the bad faith negotiation claim, the Supreme Court affirmed the trial court's decision upon concluding that the defendant's challenged actions could not constitute a violation of the MMPA because renegotiation of the loan's terms "was not a service the lender agreed to sell or the borrower agreed to buy when the parties agreed to the loan" originally and "the extent of [the bundle of services included in a loan] is fixed at the outset when the parties agree to the terms of the loan."  **Id.** at 408.  Therefore, the defendant "was not enforcing the terms of the original loan but rather contemplating creating a new agreement" when it "engag[ed] in loan modification negotiations," and the defendant's challenged conduct did not occur "in connection with" the original loan transaction.  **Id.**  Importantly, the Missouri Supreme Court noted that the plaintiff had not alleged, and that court did not consider, that the loan modification negotiations constituted a separate sale under the MMPA and that the defendant's actions were in connection with those negotiations.  **Id.** at 407 n.2.

In its second motion to dismiss, Defendant argued that this Court should apply the decision in **Watson**, supra, and dismiss the MMPA claim in Count IX because Defendant's challenged conduct does not relate to the original 2007 loan transaction but to Plaintiff's confirmed Bankruptcy Plan, which altered the repayment terms of the original loan transaction in a manner "not . . . agreed upon or even contemplated at the time the original Loan was 'sold.'"

Plaintiff counters that the Bankruptcy Code, 11 U.S.C. § 1322(b)(2), does not permit the confirmed Bankruptcy Plan to modify the loan under the circumstances here; and that **Conway**, supra, applies to allow Plaintiff's pursuit of her MMPA claims, because those claims arise out of Defendant's alleged conduct in making and collecting payments and pursuing foreclosure in connection with the original loan's terms.

Finding **Conway**, rather than **Watson**, applicable, the Court will deny Defendant's motions to dismiss Plaintiff's MMPA claims.

Nothing in Plaintiff's allegations states or indicates that the basis of Defendant's challenged conduct arises out of loan terms that differ from the terms of the original loan. Nor is there any indication in Plaintiff's allegations that Defendant and Plaintiff agreed to change the terms of the original loan agreement. In fact, allegations regarding Defendant's post-bankruptcy offer to enter into a loan modification demonstrate such an effort was unsuccessful in that Plaintiff did not agree to do that. Plaintiff's claims are not based on any conduct by Defendant arising out of that unsuccessful loan modification effort. Therefore, **Watson** is inapplicable.

Instead, Plaintiff has stated MMPA claims under the principles of **Conway**. Plaintiff is challenging Defendant's servicing of the original loan after Plaintiff's Bankruptcy Proceeding ended in late November 2012. Plaintiff's allegations demonstrate that she entered into the 2007 loan to purchase her home and suffered an ascertainable loss of money as a result of Defendant's allegedly unfair practices in trying to collect payments reportedly due from Plaintiff after the completion of her Bankruptcy Proceeding. Defendant's allegedly

unfair practices include Defendant's multiple efforts to collect fees and expenses beyond the monthly amount due under the loan, despite Plaintiff's payments or tendering of payments to satisfy her financial obligations to Defendant after November 2012 and Defendant's statements to the Bankruptcy Court in November 2012 that Plaintiff had, as of that time, satisfied all pre-petition and post-petition obligations to Defendant. Defendant's challenged conduct is connected to the original loan because that conduct arises out of Defendant's servicing of the 2007 loan.

Under the circumstances, Plaintiff's allegations in Counts II and IX state facially plausible claims for violations of the MMPA; and Defendant's motions to dismiss those counts will be denied.

Slander of Title Claim (Count IV). In Count IV, Plaintiff alleges that her default was cured by the completion of the Bankruptcy Proceeding and Plan; that she is not in default because she has tendered all required payments and has not violated the terms of the note since then; that she repeatedly notified Defendant by telephone and in writing that she was not in default and provided documents to support that position; that Defendant knew Plaintiff was not in default, but proceeded with non-judicial foreclosure and with publication of "notice of trustee sale based on default in the St. Louis Countian while knowing there was no default"; that Defendant's "knowing and willful publishing of false information regarding default on her deed of trust [wa]s malicious"; and that Plaintiff has incurred "damages, including attorney's fees, in her efforts to correct the slander to her title." (Pl. Second Am. Compl. ¶¶ 100-03 [Doc. 56 at 21].) For relief based on Defendant's alleged slander of title, Plaintiff

seeks actual, compensatory, and punitive damages in an amount exceeding $25,000.[6]

Defendant seeks dismissal of this claim under Rule 12(b)(6) because the successor trustee, not Defendant, published the notice of foreclosure sale; and because the deed of trust does not require a trustee to investigate default before publishing notice of a trustee's sale. Plaintiff responds that Defendant's trustee is not before this Court as a litigant; the trustee is also Defendant's attorney; and whether the publication was by a trustee or by Defendant's attorney, Defendant can be held liable due to its agent's conduct. Additionally, Plaintiff argues, the malice required for a slander action is demonstrated by the publication of the notice after Defendant had notice or knowledge of the absence of default. Defendant replies that this tort claim is not viable because the allegations supporting this claim also form the basis of the breach of contract claim. Furthermore, Defendant urges, Plaintiff has not set forth allegations supporting agency liability.

To state a slander of property or title claim, a plaintiff having interest in the property must allege that false words were maliciously published and resulted in pecuniary loss or injury to the plaintiff. See **Lau v. Pugh**, 299 S.W.3d 740, 748, 750 (Mo. Ct. App. 2009). Importantly, "[p]roof of falsity, alone, is not proof of malice." **First Nat'l Bank of St. Louis v. Ricon, Inc.**, 311 S.W.3d 857, 867 (Mo. Ct. App. 2010). To establish

> the existence of malice, [the plaintiff must provide evidence supporting] a reasonable inference that the representation not only was without legal justification or excuse, but was not innocently or ignorantly made. Such

---

[6] Plaintiff also requested injunctive relief to prevent the sale of her property, but the sale has been canceled, so injunctive relief is not appropriate at this time.

inference may rest on a foundation of circumstantial evidence and proof of a lack of probable cause would support an inference that the representation was not innocently made out of stupidity or ignorance but was known to be false. Where there is sufficient evidence or where there may be a fair difference of opinion on the issue of malice, the question whether the defendant in an action for slander of title was actuated by malice is one of fact for the jury.

**Tongay v. Franklin Cnty. Mercantile Bank**, 735 S.W.2d 766, 770 (Mo. Ct. App. 1987) (citations omitted; citing Long v. Rucker, 149 S. W. 1051, 1053-55 (Mo. Ct. App. 1912)). Even if the plaintiff does not suffer substantial actual damages, the plaintiff "would be entitled on proof of such charges to recover an award of nominal actual damages." **Tongay**, 735 S.W.2d at 770. Additionally, "attorney's fees and other legal expenses incurred in clearing a disparaged title are recoverable as special damages in a slander of title action." **Lau**, 299 S.W.3d at 748, 750. While the recording "of a false instrument . . . state[s] a claim under slander of title," **Euge v. Golden**, 551 S.W.2d 928, 932 (Mo. Ct. App. 1977), other circumstances also support such a claim. See, e.g., **Crowe v. Horizon Homes, Inc.**, 116 S.W.3d 618, 623-24 (Mo. Ct. App. 2003) (reversing the dismissal of a slander of title claim based on allegations that the occupiers of the land falsely represented to the county that they owned the land in order to obtain a stop work order directed against the development of the land by the owner); **Kennedy v. Kennedy**, 819 S.W.2d 406, 409-10 (Mo. Ct. App. 1991) (finding slander of title claim supported by allegations that a prior landowner's attorney's letter to the United States Forest Service, as well as that attorney's representations to a title company, knowingly and falsely stated that plaintiffs "did not have good title" to the property, so as to prevent a property exchange).

Here, Plaintiff's allegations supporting Defendant's liability for slander of title are facially plausible. Those factual allegations, taken as true, demonstrate that the notice of default and foreclosure sale was maliciously published, in that it was published after Defendant had knowledge or notice that Plaintiff was not in default, and resulted in pecuniary loss to Plaintiff, to the extent she incurred attorney's fees and may have incurred other monetary losses in her efforts to prevent and stop the foreclosure sale. The parties' dispute about whether or not Defendant published the notice, as well as Defendant's argument, first set forth in its reply, that this tort claim may not be pursued due to Plaintiff's breach of contract claim, may be presented for resolution during the course of subsequent proceedings, as deemed appropriate.

Defendant's motion to dismiss Plaintiff's slander of title claim (Count IV) will be denied.

Invasion of Privacy Claim (Count V). In support of her invasion of privacy claim, Plaintiff alleges that between March and October of 2013, Defendant made multiple phone calls to Plaintiff at her place of employment and on her cell phone, and "repeatedly sent collection letters and [other] notices" to Plaintiff in an effort to obtain Plaintiff's payment of amounts allegedly owed on the loan. As the alleged result of these actions by Defendant, Plaintiff has "suffered economic and emotional damages, including but not limited to loss of real and personal property, the loss of equity in her property, a damaged credit rating, and stress, embarrassment and humiliation."

Characterizing this claim as based on a theory of unreasonable intrusion upon the

seclusion of another, Defendant moves for its dismissal because Plaintiff did not allege that the subject matter of her loan is a secret and private matter or a matter she had a right to keep private in light of her Bankruptcy Proceeding. Additionally, Defendant urges that Plaintiff did not allege facts demonstrating that Defendant's collection efforts rose to the level of a "highly offensive" intrusion.

Plaintiff does not dispute that her invasion of privacy claim is based on a theory of unreasonable intrusion upon Plaintiff's seclusion. In response to Defendant's arguments, Plaintiff contends that, for this theory, the Missouri Supreme Court does not require that the subject matter be "a secret and private matter," and this Court should not resolve whether or not Defendant's conduct constituted a "highly offensive" intrusion because that would invade the province of the jury.

The Missouri Supreme Court has recognized that an unreasonable intrusion upon the seclusion of another is an actionable theory for an invasion of privacy claim. See, e.g., **Sofka v. Thal**, 662 S.W.2d 502, 509-10 (Mo. 1983) (en banc). Concluding that publicity is not necessary to establish an unreasonable intrusion upon the seclusion of another, the Missouri Supreme Court defined this cause of action by quoting the Restatement (Second) of Torts § 652B,

> One who intentionally intrudes, physically or otherwise upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.

**Sofka**, 662 S.W.2d at 510. In considering the scope of a defendant's liability under this

theory, the state supreme court quoted comment d to § 652B[7] of the Restatement (Second) of

Torts:

> d. There is . . . no liability unless the interference with the plaintiff's seclusion is a substantial one, of a kind that would be highly offensive to the ordinary reasonable man, as the result of conduct to which [the reasonable man would strongly object. Thus] there is no liability for knocking at the plaintiff's door; or calling him on the telephone on one occasion or even two or three, to demand payment of a debt. It is only when the telephone calls are repeated with such persistence and frequency as to amount to a course of hounding the plaintiff, that becomes a substantial burden to his existence, that his privacy is invaded.

**Id.**

Assuming "that telephone calls could constitute an actionable 'intrusion,'" the Missouri

Supreme Court in **Sofka** concluded the entry of summary judgment in the defendant's favor

was appropriate because the plaintiff's deposition testimony revealed that she had received six

to eight telephone calls, at least some of which disrupted her sleep, from the defendant at her

home over an approximately four-month period; that none of the callers threatened or

screamed at her; and that the defendant did not call her at work. **Id**. "While ordinarily a

question for the jury, [the state supreme court could not] find the six to eight polite telephone

calls made by [the defendant] to plaintiff over a period of several months amount[ed] to the

type of intrusion that could be found highly offensive to the ordinary person or to constitute

'hounding.'" **Id.** at 511.

Here, Plaintiff's alleged circumstances, which must be taken as true for purposes of

---

[7] In the opinion, the court mistakenly cited to § "650B," a section that does not exist in the Restatement (Second) of Torts. See **Sofka**, 662 S.W.2d at 510.

Defendant's motion to dismiss, demonstrate that, over the course of several months from early 2013 until late in 2014, Plaintiff received from Defendant numerous telephone calls at work and on her cell phone, as well as several written communications from Defendant, including default and foreclosure notices, at her home in Defendant's persistent effort to obtain from Plaintiff payment of amounts Plaintiff had either paid or unsuccessfully tendered to Defendant, and despite Plaintiff's efforts to establish that she was not in default. Such conduct is much more offensive than the six to eight "polite" telephone calls received over a several-month period by the plaintiff in **Sofka**, a plaintiff who had not made or offered to make the payment at issue in that case. Under the circumstances, it is plausible that a reasonable person would consider as "highly offensive" the collection efforts Defendant allegedly directed at Plaintiff.

Plaintiff's allegations set forth a facially plausible claim for invasion of privacy through unreasonable intrusion on Plaintiff's seclusion. Defendant's motion to dismiss this claim (Count V) will be denied.

Wrongful Foreclosure (Count VI). The parties do not dispute that there is no cause of action in Missouri for attempted wrongful foreclosure. See **Reese v. First Mo. Bank & Trust Co.**, 736 S.W.2d 371, 373 (Mo. 1987) (en banc). The parties also do not dispute that the previously scheduled foreclosure sale of Plaintiff's home was canceled. The record does not reveal any additional efforts to proceed with a foreclosure sale of Plaintiff's home. Therefore, Defendant's motion to dismiss this claim will be granted.

Plaintiff asks the Court to provide Plaintiff with the opportunity to amend or

supplement the pleadings "if Defendant should take any action during the pendency of this lawsuit to schedule an additional non-judicial foreclosure."  At this stage of the proceedings, there is no indication that Defendant will pursue another non-judicial foreclosure sale of Plaintiff's home while this lawsuit is pending.  Therefore, the Court will reserve for another day the question whether Plaintiff may amend or supplement her pleadings due to any re-scheduling of a foreclosure sale of Plaintiff's home that may occur in the future.  Plaintiff may present that issue, as necessary, during the course of subsequent proceedings in this case.

## CONCLUSION

Defendant's first motion to dismiss [Doc. 18] will be granted only so as to dismiss the wrongful foreclosure claim in Count VI of the second amended complaint.  In all other respects, Defendant's motions to dismiss [Docs. 18 and 58] will be denied.

The hearing scheduled for 9:30 a.m. on November 20, 2014, to consider Plaintiff's pending motion to compel production [Doc. 62] remains set.

After careful consideration,

**IT IS HEREBY ORDERED** that Defendant's first motion to dismiss [Doc. 18] is **GRANTED in part** with respect to the wrongful foreclosure claim in Count VI of the second amended complaint only, and is otherwise **DENIED.**

**IT IS FURTHER ORDERED** that Defendant's second motion to dismiss [Doc. 58] is **DENIED**.

**IT IS FINALLY ORDERED** that the wrongful foreclosure claim in Count VI of the second amended complaint is **DISMISSED**.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this 19th day of November, 2014.