## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| 1. JEANNIE K. MAY, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No.: 4:14-CV-578-TCM |
| | ) | |
| 1. NATIONSTAR MORTGAGE, LLC. | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF JEANNIE K. MAY'S TRIAL BRIEF.

**HUMPHREYS WALLACE HUMPHREYS, P.C.**
David Humphreys, OBA # 12346, *Pro Hac Vice*
Luke J. Wallace, OBA # 16070, *Pro Hac Vice*
Paul Catalano, OBA # 22097, *Pro Hac Vice*
9202 South Toledo Avenue
Tulsa, Oklahoma 74137
918-747-5300 / 918-747-5311 Facsimile

Elizabeth S. Letcher, CA Bar No. 172986, *Pro Hac Vice*
Law Offices of Elizabeth S. Letcher
60 29th St, No. 221
San Francisco, CA 94110
415-643-4755 / 415-738-5400 Facsimile

Robert T. Healey, Jr., MO Bar No. 34138
Healey Law LLC
640 Cepi Drive, Suite A
Chesterfield, Missouri 63005
636-563-5175 / 636-590-2882 Facsimile
**ATTORNEYS FOR PLAINTIFF**

I.    FACTUAL BACKGROUND

    A.    May Completed Her Chapter 13 Plan

    B.    Servicing Failures Begin

    C.    Nationstar Wrongfully Removed Funds Creating a "DEFAULT"

    D.    Nationstar's Outrageous Wrongful Conduct Was The Foreseeable Result Of Its Policies And Practices, Not Unpredictable Human Error

II.   CLAIMS AND DEFENSES

    A.    Nationstar Will Be Liable for Actual Damages for its Violation of the Real Estate Settlement and Procedures Act (RESPA) 12 U.S.C. §§ 2601 *et seq.* (Counts I and VIII)

    B.    Nationstar Will Be Liable for Actual and Punitive Damages for its Violation of the Missouri Merchandising Practices Act ("MMPA") (Counts II and IX)

    C.    Nationstar Will Be Liable for Actual and Statutory Damages for its Violation of the Fair Debt Collection Practices Act (Count III)

    D.    Nationstar Will Be Liable for Actual, Statutory and Punitive Damages for its Violation of the Fair Credit Reporting Act, 15 U.S.C. 1681 *et seq.* (Count X)

    E.    Nationstar Will Be Liable for Actual And Punitive Damages for Its Slander of Title  (Count IV)

    F.    Nationstar Will Be Liable for Actual and Punitive Damages for Invasion of Privacy (Count V)

    G.    Nationstar Breached Its Contract With Ms. May (Count VII)

III.  ANTICIPATED ISSUES

    A.    Plaintiff's Evidence Will Support an Award of Punitive Damages

    B.    The Court Should Admit Highly Probative Testimony of Nationstar's Virtually Identical Handling of Complaints from Another Borrower Whose Accounting Nationstar Similarly Mishandled after Bankruptcy Discharge

        1.    The Prostredny Testimony Is Relevant

a.      Postredny's Experience Shows Nationstar's "Pattern or Practice" of Noncompliance with RESPA

b.      Postredny's Experience Is Relevant to Plaintiff's Claim for Statutory Damages for Nationstar's Frequent, Persistent Noncompliance with the FDCPA

c.      Postredny's Testimony is Relevant to Plaintiff's Claims for Punitive Damages Under the MMPA, FCRA, and for Nationstar's  Slander of Title and Invasion of Privacy

d.      The Prostredny Testimony Is Relevant to Nationstar's Awareness of The Harm Its Unlawful Conduct Was Causing, And Intent

e.      Prostredny's Testimony Is Relevant as it Undermines The Credibility of Nationstar's "Uniqueness" Defense

2.      Ms. Prostredny's Experience Is Similar In Kind And Close In Time To the Event At Issue

3.      Plaintiff Will Be Able To Prove That Nationstar Unlawfully Failed To Investigate And Demanded Amounts Not Due By A Preponderance Of The Evidence

4.      The Prostredny Testimony Is Not Unduly Prejudicial and rebuts the testimony of Nationstar

C.      Nationstar Should be Estopped from Arguing that Plaintiff's Written Communications Were Not Qualified Written Requests.

# I.  FACTUAL BACKGROUND

## A.  May Completed Her Chapter 13 Plan

Plaintiff Jeannie May is a 59 year old single woman. In 2007 she was facing serious financial hardship due to her mother's prolonged hospitalization and her role as caretaker.  She filed for Chapter 13 Bankruptcy protection in November 2007. Starting in December 2007, she made Plan payments to the Trustee, and regular mortgage payments to her loan servicer. In November 2010, servicing of Ms. May's loan transferred from CitiMortgage to Nationstar.

At the conclusion of the bankruptcy case in November 2012, Nationstar confirmed under oath that "the debtor has paid in full the amount required to cure the prepetition default to be paid through the Chapter 13 Plan," and that "debtor has paid all post-petition amounts due to be paid to the secured creditor as of the date of the Trustee's cure notice."  Nationstar never sought payment of any other fees or arrears during the bankruptcy.[1]

In December of 2012, Jeannie May achieved her primary goal of the plan:  she was finally current on her mortgage.  She was relieved, excited, and ready to rebuild her life.

## B.  Servicing Failures Begin

Nationstar sent May its first post-bankruptcy statement February 26, 2013, claiming $2,127.02 for "Lender Paid Expenses."  In March 2013, she started getting collection calls claiming that she was *five months delinquent* on her loan.

The next weeks were the start of a frustrating and increasingly frightening new reality: Nationstar called demanding multiple payments; May would say she didn't owe them, and the collectors would tell her to provide "proof" that she had made her payments.  She did so, repeatedly, sending bankruptcy discharge documents (including Nationstar's acknowledgment

---

[1]  See Bankruptcy Rule Civ. Pro. 3002.1(c)(requiring notice of any recoverable fees, expenses or charges incurred in connection with the claim within 180 days).

that she had cured her default and she was current), Nationstar's ledgers reflecting her payments, and her own bank statements showing the payments cleared. No Nationstar representative ever followed up with May to explain to her why she was five months past due.

By the end of April 2013, Nationstar was trying to collect over $8,000 that was not owed.[2] Her monthly payment jumped by almost 20%.[3] An April 19, 2013, letter notified Ms. May she had officially been declared "in default" and if she didn't pay by May 24, 2013, Nationstar would accelerate the note, refuse monthly payments, and refer her loan to foreclosure.

Although May provided proof of payments to "research" multiple times, it achieved nothing. Nationstar employees told May that she was being collected on because she had not made a payment since December of 2012, that the Chapter 13 Trustee failed to take care of certain charges, and that misapplied funds had been refunded to CitiMortgage. May repeatedly explained and sent paperwork showing she made all of her payments and court documents showing the bankruptcy had taken care of all charges.

Agyeman testified neither she nor her manager had authority to speak with "Research" and she could offer no testimony that any research was ever performed or any follow up was made concerning May's April 30, 2013 call. Agyeman nonetheless promised to contact May with more information and promised that "after their research, [the research department] will definitely send you a mail explaining their outcome."

## C. Nationstar Wrongfully Removed Funds Creating a "DEFAULT"

Nationstar 30(b)(6) witness, Vice President A. J. Loll, testified that "in reality, she wasn't delinquent". Nationstar admits that the "lender paid expenses" it placed on her February 2013 statement were wrongful and "should have been removed as

---

2 Nationstar's April 2013 statement demanded $2,097.20 for "Lender Paid Expenses," and had added new demands for "Past Due Payments" in the amount of $4,296.90 and "Unpaid Late Charges" of $919.80. .
3 Nationstar had also run a new escrow analysis based on the alleged arrears, and so was demanding an increased monthly payment of $999.45.

part of the bankruptcy reconciliation process at the time of the discharge." [4] May pointed out in her very first calls that Nationstar was not permitted to add *any* such fees to her account after the bankruptcy discharge -- much less impose charges because Nationstar confused two accounts.

Ms. Agyeman acknowledged that even a cursory review of Nationstar's account payment history shows it went from current to five months past due in a twenty-one day period between March and April 2013. In early 2013, Nationstar first looked at the accounting information provided during the servicing transfer in November 2010 by CitiMortgage and saw that in 2008 the prior servicer applied a bulk check from a bankruptcy trustee intended for distribution to many loans, including Jeannie May's, to just one loan, that of borrower Jeanne Hoyt. The impact to May was that her account was not credited for $51.00. Nationstar could have, anytime from November 2010 through February 2013, simply credited May's account for $51.00. Instead, Nationstar, with no disclosure to May, removed $5759.02 (the entire amount of the trustee's check) from May's account. This action reversed numerous payments she made causing her account to reflect that it was five months past due. Nationstar treated her as delinquent from February 2013 to well into 2015, including scheduling a sale date for her home.

Paul Muller, in the bankruptcy department, eventually reviewed the loan with his manager in late May 2013 and "requested [an] adjustment to bring the loan current" because "there was a reversal after the BK was discharged." The adjustment requested by Muller would have eliminated the reversal of four monthly payments, associated late fees, and the improper charges of $2,097.20 in "lender paid expenses." The cash department rejected his request within an hour because "there is no bankruptcy code, resubmit the request in corr." Muller never followed up, and as a result, in Mr. Loll's words, "the situation was never resolved."

Instead of responding to Ms. May's pleas to correct her account, Nationstar tried to force

---

4    Although Mr. Loll testified that the account should have been "audited" before the bankruptcy file was closed. Nationstar's Kimberly Dotson in fact reviewed the file and determined no audit was needed.

a contractual modification of her note upon her. An urgent letter exhorted her to "Avoid Foreclosure – Act Now" and gave her the option of either staying in her home and "stop the foreclosure process" with a modification" or "leave your home and avoid foreclosure."

May responded unequivocally that she did not want a modification. Even Nationstar's notes of the call are clear: "Refuses mod. She is not late." Ms. May refused with good reason: a modification adds all of the wrongful charges to her loan balance and damages credit.

Nationstar proceeded with the modification without her consent, and treated her monthly payments as of June 2013 "trial period payments." Despite documented requests by May to treat her monthly payments as regular and not modified, Nationstar representatives did not do so. The system continued to treat her payments as modified payments. Nationstar employee testified she didn't have the authority to cancel the modification and would have relied on her supervisor to do so. Supervisor Derrick Richardson reviewed her account twice but kept her in an active trial period, even though Ms. May's staunch refusals (and her reasons) were plainly set out in the servicing notes. Nationstar ignores its notes and May and decides the trial modification is valid.

By August 2013 Ms. May had been dealing with Nationstar's relentless collections for over five months. Despite her repeated pleas not to call her at work and to communicate only with her attorney, Andrea Kimbuta called her at work to demand payment. Ms. May renewed her refusal of the modification (and her protests that she was current). Nonetheless, Nationstar processed her August payment as a trial payment and sent her final modification documents on August 21, 2013.

Ms. May's unbearable frustration shows in the recording of Ms. Kimbuta's August 22 call to her – "I've asked you not to call me [] at work repeatedly, which you keep doing. My boss sits ten feet from me" and "I didn't request a modification. I've told you people that a

hundred times." When she called Nationstar later to complain about the continuing calls at work, recounting she had been "put through hell" and had developed digestive issues, Nationstar employee Chris Joseph mocked her. As she explained at her deposition, the collection calls had caused her both embarrassment ("It's embarrassing to have, you know, people overhear your phone calls and know what's going on") and humiliation:

> [T]he humiliation is because, you know, I've got all these people telling me that I've done something wrong when I haven't. And when I try to explain to them that I haven't, I had one Nationstar representative laugh at me. When I told him that this had put me through hell and that I couldn't sleep at night, he laughed at me and said, well, you just admitted it. I said, what are you talking about? He said, well, if you're not sleeping at night, it's because you know you're in arrears. So that's humiliating.

It was only after she called back, demanded a supervisor, and spent another half hour on the phone with *four* more Nationstar employees that the trial modification was removed so that her funds could be applied to her regular payments. The last person advised her to fax in "proof" she made each payment even though Nationstar's own payment records showed she had.

May sent another qualified written request in late August 2013 asking for an explanation of the charges imposed after bankruptcy, the "arrears," and the basis for the alleged escrow shortage that was driving her payments up, and demanding corrections to her account. Nationstar sent a nonsensical form letter attaching loan documents, a payment history, and information about the owner of the note. The letter did not answer any of her pointed questions.

May next received a new acceleration notice demanding payment of $6,013.28 and her September 2013 payment was rejected. When Ms. May called to find out why, she was told her loan was being referred to foreclosure in October. In early November she was notified Nationstar had retained foreclosure counsel.

May herself retained an attorney, Robert Healey, who sent a letter on Ms. May's behalf to the foreclosing law firm. It succinctly told the story of Nationstar's wrongful collection, and

protested yet again that May was current and Nationstar had no right to foreclose. The sum total of the law firm's December 30, 2013, response was to send "verification of the debt" -- the Note, Deed of Trust, another payment history, and the name of the original creditor. Mr. Healey wrote back that the letter "does not answer any of the questions, issues or concerns raised in my original correspondence," and demanded genuine answers.

On January 21, 2014, the law firm sent a Notice of Trustee's Sale, stating it planned to sell Jeannie May's home to the highest bidder at public sale on Monday, February 24, 2014, at 10:00 a.m. A Nationstar employee verified to Fannie Mae, the taxpayer-sponsored investor on the loan, that "a non-foreclosure outcome could not be reached."

May filed her original Petition and motions for a temporary restraining order on Wednesday, February 19, 2014. When the court set a hearing date for the motion, Nationstar agreed to cancel the sale date, but refused to withdraw the Notice of Default.

Nationstar continued to refuse payments and ratcheted up its bogus default charges. The March 2014 mortgage statement demanded an astonishing $11,094.57, and showed additional charges, including legal fees, of $2,607.20, even higher monthly payments, and a negative escrow balance of $2,963.03. It was only after May sent yet another notice of error challenging the new monthly payment of over $1,000 that Nationstar finally admitted *any error at all*.

On April 30, 2014, following this action being brought in February of 2014 just days before the foreclosure sale, Nationstar first acknowledged that it had improperly removed over $5,000 from the account. This acknowledgement did not come with a full correction of her account. The unaddressed servicing failures included increased escrow charges, unexplained increases in her monthly payments, lack of a correct escrow analysis, failure to correct a year's worth of derogatory credit reporting, and failure to correct two years' worth of 1098 mortgage

interest statements.  Nationstar falsely claimed May was still in bankruptcy, and that the sale date was "stopped due to the automatic stay of the bankruptcy."

May's follow up letter at the end of May 2014 explained all these deficiencies and included nine months' worth of payments with her letter – one check for $907.05 (the new amount Nationstar was demanding of her) and another for $7,215.46 – all payments that Nationstar had rejected and returned to her during the previous eight plus months.   Nationstar's June 2, 2014, response said her letter was being referred to the legal department, and that "[a]s of the date of this correspondence, the account is approximately nine (9) payments delinquent and contractually next due for the October 1, 2013 monthly installment."   Jeannie May was receiving no mortgage statements, was locked out of online access to her account, and Nationstar representatives refused to speak to her on the phone because of the litigation.   Nationstar rejected her July 2014 payment, and her own bank refused to process any more electronic payments to Nationstar because so many had been returned.

Nationstar's credit reporting got worse after she complained. When she disputed the reporting with Equifax in June 2014, Nationstar responded by adding more months of negative pay history instead of fixing its error.  Although it changed the "amount past due" from $12,841 to $1,664, it showed her as seriously in default for nearly three times as long.  As of July 2014 – months into this lawsuit –Nationstar was reporting her as continuously delinquent for 22 months with a delinquency of up to 150-179 days past due and changed the date of "first delinquency" from December 2010 to August 2010.

Nationstar didn't begin correcting its false, negative reporting until October 2014, when it asked Equifax to remove all the negative payment history and report Ms. May as current since

the bankruptcy discharge. It made further corrections in May 2015, removing the first delinquency date and removing the "in collections" special comment code.

In the nearly three years since the bankruptcy discharge, and over a year and half of litigation, Nationstar has corrected many errors. But, numerous others remain including payments of $1,534.26 being applied to corporate advances that she did not owe. Ms. May's April 15, 2015, statement still showed charges for $1,225.20 paid to Bryan Cave for attorney's fees plus property inspection fees. Nationstar has yet to correct its false underreporting to the IRS of the mortgage interest paid in 2012, 2013, and 2014.

### D. Nationstar's Outrageous Wrongful Conduct Was The Foreseeable Result Of Its Policies And Practices, Not Unpredictable Human Error

Nationstar characterized what happened here as:

the only account that I'm familiar with in 14 years with the company that ever got to this stage that we didn't figure out well in advance that – that I had this many departments not be able to solve the puzzle, only account…. It was a rare event. And then for no one to figure it out is frustrating, but that's the uniqueness of Jeannie May.[5]

Nationstar's servicing procedures are designed to maximize completion of discrete tasks, such as requests for payments or soliciting modifications. Its policies and processes deprived customer facing employees of any authority or responsibility to listen to or solve borrower problems. Nationstar employees were trained to rely solely upon the screen in front of them, without question, rather than listening to the borrowers or providing them with any assistance. For instance, despite Ms. May's protests that she was current, Ms. Agyeman steadfastly claimed Ms. May was behind by 5 months and about $8,000 because "the system" was telling her that:

---

5  Mr. Loll made similar comments such as "This is a one-off situation"; "This is a unique situation"; "I have never seen this situation get this far down the road without it getting resolved" ;"you're still dealing with the human factor, and no – this is not robotics in there. You're still having an individual human being analyzing a problem with the resources they have and came – they came to a conclusion that was inaccurate"; "They never truly got it right."

"Yes. I was using LSAMS and that was what was showing at that time." "I do not believe that the system is wrong."

Every representative had the same response: whatever the screen said was the truth. Nationstar representative Chris Joseph explained that when Ms. May protested she was current, his "training" was to look at the account standing – that is, *to look at the top of the screen* -- which would show him whether the account was past due. He had *never* seen a case where "the system" was wrong; if the loan was showing as four months past due "I'm pretty sure it would have got escalated if it wasn't in the right status… it wouldn't have got this far if that wasn't the right, correct status of her being past due" Ms. May clearly just "didn't want to hear what was being said."

> Andrea Kimbuta, yet another of the collectors, had the same attitude:
>
> Q. At the time of this call, do you know whether or not my client was five months behind or not?
> A. At the time of the call, I could tell she was five months, according to the screen.
> Q. So the information that you are relying on is information that is provided by Nationstar. Right?
> A. Yes.
> Q. And if the system says she's five months behind, in your world she's five months behind. Correct?
> A. Yes."

The call transcript conveys Ms. Kimbuta's condescending disbelief when Jeannie May tried to explain that she was current when she states "I'm not understanding. Why don't you think you owe us?" But, Ms. Kimbuta's notes of the call reveal the culture at Nationstar:

> [R]efused to listen to rep. Stated she's not behind and NS, which is Nationstar, is wrong. Mrs. stated that she has an attorney working on her case. And NS, which is Nationstar, made a mistake of showing her delinquent. After the BK, which is the bankruptcy, was discharged, rep, which is representative, **tried to explain payment history to Mrs. But Mrs. would not understand.**"

Even Mr. Loll's testimony reflected disbelief that a borrower could ever be correct. When asked whether Nationstar had corrected Ms. May's credit, he answered,

> This is a unique situation because this particular borrower was right. This particular borrower was not delinquent. So she had the facts right. But you have most cases borrowers when they challenge and think that they're current are not current…. So you just don't automatically change the credit report just by someone telling you, I'm current… But she was right… They were thinking she was wrong.

Nationstar by policy limited or severed communication and follow up between departments. Front line representatives by training and policy did not even look at the system records available to them (other than the total amount due screen); they simply referred her to "Research" for May to follow up (or, in some instances, bankruptcy and escrow) and placed the burden on her to prove she wasn't delinquent. As Ms. Kimbuta bluntly put it: "I don't take care of the research part."[6]

Nationstar procedures provided no way for front line employees to follow up on the progress of any internal investigation. Internal communication with "Research" was by manager, electronic, and one way only. Front-line representatives had no phone number or email to contact the Research Department directly, and no access to the Research Department's electronic notes. "Research" was overworked in mid-2013, because Nationstar had "just recently received a lot of loans from Bank of America." Only after research was complete, could the customer service representatives see the response letter in ordinary system records, but otherwise, they understood the only way to follow up on a research request was by a manager.

---

6 The "not my job" attitude apparently extended beyond research and investigation: Ms. Agyeman, a "foreclosure prevention specialist," had no idea what it means for a loan to be referred to foreclosure, or what might happen once a loan is sent to foreclosure attorneys. "I'm not trained in that area sir, to know what they do. That's their job." Then again, Mr. Loll testified that Nationstar set up its servicing to make the foreclosure, currency, and bankruptcy functions completely separate from loss mitigation and Research.

Any follow up based on individual initiative was even more unlikely because of the enormous pressure on employees handling 500-1000 accounts. They were expected to complete 100-200 calls a day. They got notices throughout the day on how they were doing, and daily status reports went to the entire team, showing how they ranked on getting through calls. Their time actually making calls was monitored as well; they were only given certain periods "off the phone" – "an hour here and then an hour here, if time permitted" -- to work accounts, review notes and emails, and upload documents. To make matters worse, although representatives could educate themselves by looking through the file if they were making outbound calls, when calls came in through the dialer, they had no ability to access notes until the borrower was on the line.

Nationstar wanted quantity, not quality: as Ms. Nance explained, "conversations that had any kind of substance" with borrowers impaired her ability to get through the calls; if she didn't make it through her quota, her manager would "ask what happened, and you would have to explain" and get "coaching" if necessary.

Structural incentives created by Nationstar caused representatives to demand repayment or to try to force modification on Ms. May rather than investigate her complaints. Nationstar circulated reports about how many payments each representative had been able to squeeze from borrowers and how many trial or permanent modifications they facilitated. Representatives were given "goals" to meet each month for achieving workouts – reinstatements, repayment plans, trial modifications, permanent modifications, short sales, or deeds in lieu. Representatives were *compensated* with bonus payments based on workouts completed. The maximum monthly bonus based on workouts, including trial modifications and reinstatements, was $2,000; that could account for half of a loss mitigation employee's take-home pay.

Nationstar itself was paid by the investor for "workouts" as well. No incentives were given for completing investigations that resulted in Nationstar errors being corrected.[7]

It was this series of conscious business choices that caused Nationstar to miss dozens of opportunities to discover and fix its payment misapplication and accounting errors. Vice President and Corporate Representative, Andrew J. Loll, acknowledged that May consistently explained that why she was current every time Nationstar spoke with her and did so on numerous occasions.

Contrary to Loll's testimony for Nationstar, its mistreatment of May is not unique. Jennifer Prostredny, another Nationstar borrower, experienced similar mistreatment. Like May, Ms. Prostredny emerged from bankruptcy after having made every payment, only to have Nationstar tell her she was nearly $10,000 in arrears. Like Ms. May, she faxed in a complaint, including her same notice of discharge from the bankruptcy trustee, and ledger of payments. Like Ms. May, she was repeatedly told that she had to prove she was current, but when she sent in her proof over and over, it was ignored. Nationstar responded multiple times, in writing, that there was "no error." Like Ms. May, she suffered rude treatment by Nationstar representatives. Like Ms. May, she was referred to foreclosure; she called them "frantic," telling the foreclosing law firm that she had provided proof of her payments and this was "fifth grade math." Finally, after she had complained to multiple government agencies, Nationstar conceded error. Ms. Prostredny directly asked Richard Compton, the AVP of bankruptcy loss mitigation who finally resolved her complaint, what policies and procedures Nationstar had in place to prevent such problems from happening; he responded that he would "look into it." Compton never followed up

---

7  In contrast, representatives were not rated on how they reviewed file notes or whether they filled out research request forms properly.

II.    **CLAIMS AND DEFENSES**

   A.    **Nationstar Will Be Liable for Actual Damages for its Violation of the Real Estate Settlement and Procedures Act (RESPA) 12 U.S.C. §§ 2601 *et seq.* (Counts I and VIII)**

   The elements of a claim under RESPA are established by the statute.  For Plaintiff to prevail she must show the following:

   (1) Defendant received a "qualified written request" from the borrower or her agent.

      (a) a qualified written request is any written correspondence, as long as it is not written on a payment coupon, that includes the name and account number of the borrower and the reasons the borrower believes the account is in error.

   (2) that the Defendant failed to do one or more of the following

      (a) acknowledge receipt of the correspondence within 5 days excluding holidays, and weekends (unless the error is corrected within 5 days);

      (b) make appropriate corrections in the account and transmit notice of the correction to the borrower;

      (c) conduct an investigation and provide the borrower with a written explanation or clarification that includes a statement of the reasons the servicer believes the account is correct and the name and telephone number of an employee, office or department that can assist the borrower;

      (d) conduct an investigation and provide the borrower with a written explanation or clarification that includes information requested by the borrower or an explanation of why the information is unavailable.

12 U.S.C. § 2605(e)(1) & (2).

   RESPA provides borrowers a tool to force mortgage servicers to answer their questions and fix problems. RESPA requires servicers to either make corrections to the account, "clarify

why the account is already correct," or explain why the information cannot by obtained or provided by the servicer.   12 U.S.C. § 2605(e)(2)(A), (B), (C); *Marais v. Chase Home Fin., LLC*, 24 F. Supp. 3d 712, 721 (S.D. Ohio 2014).   In 2013, RESPA required the servicer to respond within 60 business days.   As of 2014, the servicer has 30 business days to respond.

A rote response enclosing inaccurate documents fails to satisfy RESPA.  *See Marais*, 24 F.Supp.3d at 724 (a genuine explanation addressing the borrower's individual circumstances is required; where a borrower "alleges that payments have been misapplied and her account has been incorrectly charged fees, it clarifies and explains nothing for the servicer to simply send the borrower new copies of documents she probably already has showing that the fees were indeed charged and the payments unallocated; *Bryce v. Lawrence (In re Bryce),* 491 B.R. 157, 181 (Bankr. W.D. Wash. 2013)( a response which fails to address accounting discrepancies and includes inaccuracies is insufficient);  *In re Payne*, 387 B.R. 614, 636 (Bankr. D. Kan. 2008)(failure to provide a "narrative explanation of the account" and application of post-petition payments violates RESPA).

RESPA also requires that for the 60 days after receiving a payment dispute, "a servicer may not provide information regarding any overdue payment, owed by such borrower and relating to such period or qualified written request, to any consumer reporting agency." 12 U.S.C. § 2605(e)(3).

A successful plaintiff under RESPA is entitled to actual damages, including emotional distress, and to costs and attorneys' fees.  12 U.S.C. § 2605(f)(1)(A) & (3); *Papapietro v. Trans Union LLC,* 2013 U.S. Dist. LEXIS 101486 *9-*10 (N.D. Cal. July 19, 2013)*; Johnstone v. Bank of Am., N.A.,* 173 F. Supp. 2d 809, 814-16 (N.D. Ill. 2001)(collecting cases).

Defendant may also be liable for statutory damages of up to $2,000 for its "pattern or practice of noncompliance" with RESPA. 12 U.S.C. § 2605(f)(2).

### B.     Nationstar Will Be Liable for Actual and Punitive Damages for its Violation of the Missouri Merchandising Practices Act ("MMPA") (Counts II and IX)

To prevail on this claim, Plaintiff must prove:

1)   that she entered into a home loan for personal use;

2)   that the challenged conduct is "in connection with" the home loan;

3)   that by engaging in the challenged conduct, Defendant used any deceptive, fraudulent, or unfair practice, false promise or misrepresentation, or concealed, suppressed, or omitted any material fact; and

4)   that Plaintiff suffered ascertainable monetary damages or loss of property as a direct result of that conduct. RSMo.§ 407.010 et seq.

Missouri's Supreme Court recently explained the relevant contours of the Missouri Merchandising Practices Act ("MMPA").   The MMPA supplements the common law definition of fraud, creating an individual cause of action for any person who purchases merchandise for personal or household purposes "ascertainable loss of money or property as a result of an act declared unlawful by section 407.020." *Ward v. W. Cnty. Motor Co.*, 403 S.W.3d 82, 84 (Mo. 2013)(en banc), *as modified* (May 28, 2013), quoting RSMo, 2000, section 407.025.1.  The court has already held, in its November 19, 2014, Order denying Nationstar's motion to dismiss Counts II and IX, that Nationstar's mortgage servicing at issue here is conduct "in connection with" the original loan transaction, such that the MMPA applies. Docket No. 69 at 15-22, relying on *Conway v. CitiMortgage, Inc.,* 438 S.W.3d 410 (Mo. banc 2014).

### C.     Nationstar Will Be Liable for Actual and Statutory Damages for its Violation of the Fair Debt Collection Practices Act (Count III)

To prevail on her claim of violations of the FDCPA, Plaintiff must show that

(1)    that Defendant is a debt collector as defined by the statute 15 USC § 1692a(6);

(2)    that the loan in question is debt as defined by the statute15 USC § 1692a(5); and

(3)    that Defendant engaged in one or more acts prohibited by the statute including misrepresenting the legal status of a debt, threatening to take action that cannot legally be taken, using false representations to collect the debt, attempting to collect amounts not expressly authorized by the agreement or permitted by law, and failing to provide verification of the debt in response to Ms. May's disputes.  15 U.S.C. §§ 1692b, 1692c, 1692e, 1692f, and 1692g; *See, e.g., Bridge v. Ocwen Fed. Bank, FSB,* 681 F.3d 355 (6th Cir. 2012)(loan servicer engages in unfair debt collection by seeking to collect amounts borrower does not owe).

A successful plaintiff is entitled to actual damages, including emotional distress, statutory damages and attorney fees and costs. 15 U.S.C. § 1692k(a)(1);  *Edeh v. Midland Credit Mgmt. Inc.,* 748 F.Supp.2 1030, 1041–42 (D.Minn. 2010); *Jackson v. Cavalry Portfolio Services, LLC*, 2014 WL 517490, 2 (E.D.Mo. 2014). *Aronson v. Alternative Collections LLC*, No. CIV. 13-2843 MJD/HB, 2014 WL 4449695, at *3 (D. Minn. Sept. 10, 2014), quoting *Fausto v. Credigy Servs. Corp.*, 598 F.Supp.2d 1049, 1054 (N.D.Cal. 2009) (FDCPA damages include "personal humiliation, embarrassment, mental anguish or emotional distress").

Frequent, persistent, and intentional violations of the FDCPA can also result in statutory damages of up to $1,000.  *See* 15 U.S.C. § 1692k(a)(2)(A), (b)(1)(listing factors).

**D.    Nationstar Will Be Liable for Actual, Statutory and Punitive Damages for its Violation of the Fair Credit Reporting Act, 15 U.S.C. 1681 *et seq.* (Count X)**

To prevail on her claim under the FCRA, Plaintiff must prove the following:

(1)    Plaintiff disputed credit reporting with a credit reporting agency;

(2)    The Credit Reporting Agency provided Defendant with notice of the dispute;

(3)     Defendant failed to conduct a reasonable investigation and correct or delete any inaccurate information. 15 U.S.C. § 1681s–2(b);  *Hurocy v. Direct Merchants Credit Card Bank, N.A.,* 371 F. Supp. 2d 1058, 1059-60 (E.D. Mo. 2005) *citing Bruce v. First U.S.A. Bank, N.A.*, 103 F.Supp.2d 1135, 1143 (E.D.Mo. 2000).

A successful Plaintiff is entitled to actual damages under any standard.   15 U.S.C. §§ 1681n(a)(1)(A)(willful violation), 1681o(a)(1)(negligent violation).

Economic damages are not a prerequisite to award of "actual damages" under the FCRA; emotional distress alone suffices to support an award. *Bakker v. McKinnon*, 152 F.3d 1007, 1013 (8th Cir. 1998); *Cathcart v. American Exp. Co.*, 2014 WL 5320236, 5 (E.D.Mo. 2014); *Bruce v. First U.S.A. Bank, Nat. Ass'n,* 103 F. Supp. 2d 1135, 1144 (E.D. Mo. 2000)(listing cases).

Plaintiff will also be entitled to attorney's fees under FCRA.  15 U.S.C. § 1681o(a)(2); 1681n(a)(3).

Finally, the jury may award punitive damages for a willful failure to comply with FCRA. 15 U.S.C. § 1681n(a).  "Willful" failure to comply includes "reckless" violations of duty. *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 (2007)("reckless" means conduct marked by "careless disregard whether or not one has the right so to act"), 68 (conduct that causes "an unjustifiably high risk of harm that is either known or so obvious that it should be known.")

### E.     Nationstar Will Be Liable for Actual And Punitive Damages for Its Slander of Title  (Count IV)

The elements of a claim for slander of title are:

(1) publication of a Notice of Default and foreclosure sale;

(2) said publication is with "malice;" that is, after it had knowledge or notice that Plaintiff was not in default; and

(3) that Plaintiff suffered pecuniary loss. *See*, Order Denying Motion to Dismiss, Docket No. 69, at 24-25; see *also Tongay v. Franklin Cnty. Mercantile Bank*, 735 S.W.2d 766, 770 (Mo. App. 1987)(setting out elements). "Circumstantial evidence and proof of lack of probable cause" can support an inference "that the representation not only was without legal justification or excuse, but was not innocently or ignorantly made." *Tongay*, 735 S.W.2d at 770.

If Plaintiff meets her burden of proof on these elements she is entitled to recover her pecuniary losses and may be entitled to punitive damages. *First Nat. Bank of St. Louis v. Ricon, Inc,* 311 S.W.3d 857 (Mo. App. 2010)(punitive damages available); *Jeffrey v. Cathers*, 104 S.W.3d 424, 431 (Mo. App. 2003)(same); *see also TXO Prod. Corp. v. Alliance Res. Corp.,* 509 U.S. 443 (1993)($19,000 in actual damages and $10 million in punitive damages for slander of title).

### F.     Nationstar Will Be Liable for Actual and Punitive Damages for Invasion of Privacy (Count V)

Invasion of privacy is defined in the Restatement (Second) of Torts § 652B and includes the following elements relevant to Plaintiff's claim:

(1)     Intentional intrusion, physically or otherwise;
(2)     upon the solitude or seclusion of another;
(3)     that is highly offensive to a reasonable person.

*Sofka v. Thal*, 662 S.W.2d 502, 510 (Mo. 1983).   It is "the right to be left alone." *Id.* at 509.

If the Plaintiff meets her burden of proof on these elements, she is entitled to actual damages and may be entitled to punitive damages for this claim. *See Doe v. Young*, 664 F.3d 727 (8th Cir. 2011)(noting punitive damages are available under Missouri law).

### G.     Nationstar Breached Its Contract With Ms. May (Count VII)

To prevail on a claim for breach of contract, Plaintiff must prove the following

(1)     The existence and terms of a contract;

(2)      that plaintiff performed or tendered performance pursuant to the contract;

(3)      breach of the contract by defendant; and

(4)      damages suffered by the Plaintiff.  *Keveney v.. Missouri Military Acad.,* 304 S.W.3d 98, 104 (Mo.2010) (en banc) (setting out elements).

Damages include actual, consequential, and benefit-of-the-bargain damages.  *Catroppa v. Metal Bldg. Supply, Inc.*, 267 S.W.3d 812, 817-18 (Mo. App. 2008).

## III.    ANTICIPATED ISSUES

### A.    Plaintiff's Evidence Will Support an Award of Punitive Damages

Plaintiff seeks punitive damages under the FCRA and the MMPA and for her invasion of privacy and slander of title claims.  Nationstar is likely to argue that Plaintiff cannot prove the mental state required to justify an award by clear and convincing evidence.  (Nationstar's ninth affirmative defense).

The jury can impose punitive damages whenever it finds the defendant's conduct showed complete indifference to or conscious disregard for the rights, or economic interests of others, and the defendant knew or should have known its conduct created a high probability of injury.   MAI 10.07  ("Modification of MAI 10.02 – Submission of Specific Acts and Knowledge"); 10.02 ("Negligence Constituting Conscious Disregard for Others,")  39.01 ("Verdict Directing—Violation of Missouri Merchandising Practices Act"), Committee Comment C (2014)(referencing 10.07); **Haynam v. Laclede Elec. Co-op., Inc**., 889 S.W.2d 148,  (Mo. App. 1994)("rights of others"); **Chong v. Parker**, 361 F.3d 455, 460 (8th Cir. 2004)(economic interests.") **Letz v. Turbomeca Engine Corp**., 975 S.W. 2d 155, 164-165 (Mo. App. 1998)(high probability of injury).

The "reprehensibility of the defendant's conduct" is the most important factor in determining whether punitive damages are appropriate. **Estate of Overbey v. Chad Franklin**

**Nat'l Auto Sales N., LLC**, 361 S.W.3d 364, 372 (Mo. banc 2012);  **BMW v. N. Am., Inc. v. Gore**, 571 U.S. 559, 574-75 (1996).   To assess reprehensibility, the jury should consider whether:

> (1) the harm was physical as opposed to economic; (2) the conduct evinced indifference to health or safety of others; (3) the target of the conduct was financially vulnerable; (4) the conduct involved repeated actions or was an isolated incident; or (5) the harm was the result of intentional malice, trickery, or deceit, or mere accident.

**Kerr v. Vatterott Educ. Centers, Inc.,** 439 S.W.3d 802, 815 (Mo. Ct. App. 2014); **Heckadon v. CFS Enterprises, Inc.**, 400 S.W.3d 372, 382 (Mo. Ct. App), cert. denied, 134 S. Ct. 692 (2013);  **State Farm Mutual Auto Ins. Co. v. Campbell** (2003) 538 U.S. 408, 409 (repeated actions).   Other relevant factors include "the harm likely to result from the defendant's conduct as well as the harm that actually occurred." **Blanks v. Fluor Corp**., 450 S.W.3d 308, 410 (Mo. Ct. App. 2014), whether the defendant chose to "wantonly disregard the interests of those to whom some duty is owed to avoid incurring a cost," the defendant's financial worth, and the "age, health, and character of the injured party." **Letz**, 975 S.W.2d at 178.

 Plaintiff's evidence will amply show that Nationstar's conduct was not a unique succession of mistakes, unpredictably caused by human error.  Instead, other "root causes" shine through Nationstar's written records, the phone call recordings, and the testimony of its employees to be presented at trial.  Nationstar's insistence on following procedures for defaulted accounts, even if its accounting was inaccurate, coupled with its ongoing failure to investigate Ms. May's complaints, created "high degree of probability" that its conduct would result in injury,  **Letz ,** 975 S.W. 2d at 164-165.  Its institutional failures made harm more likely as well:  it set up a "research" system that kept borrowers in the dark.  It failed to train its workers to even read its records.  It set up work expectations that actively discouraged genuine investigation, or even "escalation" to a manager.  It rewarded collection or modification above all else.  Plaintiff's

evidence will show that Nationstar has cut too many corners creating a high-volume servicing system, hoping that financially vulnerable borrowers will give in and pay amounts they don't owe rather than face foreclosure.   This evidence, together with the testimony of another Nationstar borrower treated in an almost identical fashion (addressed below) will be more than sufficient to submit the case to the jury.  *Cf.* **Parsons v. First Investors Corp**., 122 F.3d 525, 530 (8th Cir. 1997)(affirming punitive damages, where evidence at trial included evidence of harm to similarly situated others, that actionable misrepresentations were the result of a policy, that the defendant company's representatives were trained to gloss over risks, and that the victims were vulnerable, and jury could have inferred from this evidence that the defendant knew its misrepresentations were misleading).

Under the FCRA, "Any person who willfully fails to comply with any requirement imposed under this subchapter with respect to any consumer is liable to that consumer in an amount equal to the sum of . . . . .(2) such amount of punitive damages as the court may allow." 15 U.S.C. § 1681n(a).   "Willful" failure includes a reckless violation of duty, with conduct that causes an unjustifiably high risk of harm that is either known or so obvious that it should be known. **Safeco Insurance Company of America v. Burr**, 551 U.S. 47, 57, 68 (2007).  There is ample evidence to support a finding that Nationstar acted either willfully or recklessly in its investigation and response to May's dispute of information it was reporting to Equifax.

**B.      The Court Should Admit Highly Probative Testimony of Nationstar's Virtually Identical Handling of Complaints from Another Borrower Whose Accounting Nationstar Similarly Mishandled after Bankruptcy Discharge**

Plaintiff plans to present the videotaped deposition testimony of Jennifer Prostredny and documents she produced.   Like Ms. May, Ms. Postredny emerged from bankruptcy current on her mortgage, only to have Nationstar immediately claim she was in default.  Like Ms. May, she

repeatedly wrote, called, and submitted proof of her payments and cure in bankruptcy. Her

experience and Nationstar's response was nearly identical to that of Ms. May. She endured:

• the same repeated demands that she "prove" she was current;

• similar boilerplate responses to her qualified written requests, which showed Nationstar
   had failed to conduct a reasonable investigation (or even review the materials she sent);

• the same refusal to accept payments;

• the same unfair collection practice of imposing a "trial" modification that would
   recapitalize arrears, even though she disputed those arrears

• similar harm (profound distress as Nationstar started the foreclosure process).

Moreover, Ms. Prostredny will testify to her conversations with Nationstar Assistant Vice

President of Richard Compton in August, 2014. He claimed that he problems were unique,

saying that "this doesn't happen," and he would "look into" Nationstar's processes to ensure it

wouldn't happen again.

In this matter, Nationstar's representative pursuant to F.R.C.P. 30(b)(6), Andrew Loll,

testified that Nationstar was rated by Fannie Mae as a top-tier, five-star servicer. He stated that

"[t]his was a unique situation. I mean, if you want to really look at it from my eye level, let's

start. You got—well, I'm not going to go that direction, but I can tell you why this account is

unique, and it doesn't happen—out of two and a half million loans serviced, this situation

doesn't happen on other accounts." Loll went on to state that Ms. May's account was "**the only

account that I'm familiar with in 14 years with the company** that ever got to this stage that

we didn't figure out well in advance that . . . went right from department to department, never

got questioned in account services of why we're doing this on a seasoned account. It was a rare

event. . . if I would have saw this case before, I would have predicted this would have got

resolved by this person and this person before it would have ever got there. This case, it didn't

happen. It truly was a fluke that our foreclose—our loss mit person couldn't figure it out, our research person couldn't figure it out, and our bankruptcy person didn't double check when he did the audit. **I have never seen that happen ever**, and **if that was really indicative of how we do our servicing, Fannie Mae would not have rated us a five star servicer**, which is next to impossible to get that rating from Fannie Mae investor." Mr. Loll again testified that May "didn't experience normal servicing that Nationstar gives customers. She got in – in – in a situation, not her error, but a situation occurred outside the norm and these sequence of events happened. They happened to her. **They didn't happen to any other borrower.**" Nationstar repeatedly asserted that Ms. May's situation was unique, unheard of, and a fluke in an effort to bolster its position that Ms. May was simply the victim of an unprecedented series of errors.

The similarities between Ms. Prostredny's experience and Ms. May's experience belie this position and Ms. Prostredny's experience is admissible under Fed. R. Evid. 404(b) to show "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." **Batiste-Davis v. Lincare, Inc.**, 526 F.3d 377 (8th Cir. May 19, 2008).

In the Eighth Circuit, Rule 404(b) is a rule of inclusion. **King v. Aherns**, 16 F.3d 265 (8th Cir. 1994); **United States. v. Smith**, 383 F.3d 700 (8th Cir. 2004). "Evidence is admissible under Rule 404(b) if it is relevant to a material issue, proved by a preponderance of the evidence, its probative value is not outweighed by its potential for prejudice, and it is similar in kind and close in time to the event at issue." **Jones v. Forest City Grocery, Inc.**, No. 4:06-CV-00944-BSM, 2008 WL 2120075, at *1-2 (E.D. Ark. May 20, 2008), *citing* **King v. Aherns**, *supra.*; **United States v. Lasley**, No. 14-CR-45-LRR, 2014 WL 6775539, at *2-3 (N.D. Iowa Dec. 2, 2014)(same, *citing* **United States v. Johnson**, 439 F.3d 947, 952 (8th Cir. 2006)). The trial court's broad discretion to admit wrongful act evidence will be reversed only when "the evidence

in question clearly has no bearing upon any of the issues involved." **United States v. Wagoner**, 713 F.2d 1371, 1375 (8th Cir. 1983), *quoted in* **McElgunnv. CUNA Mut Group,** 79 Fed. R. Evid. Serv. 795  (S.Dak. 2009), **U.S. v. Huff**, 959 F.2d 731 (8th Cir.) , *cert. den*. 506 U.S. 855 (1992)(discretion).

The Prostredny testimony is plainly admissible under these criteria.

## 1. **The Prostredny Testimony Is Relevant**

### a. **Postredny's Experience Shows Nationstar's "Pattern or Practice" of Noncompliance With RESPA**

Plaintiff seeks statutory damages for Nationstar's pattern and practice of noncompliance with RESPA under 12 U.S.C. § 2605(f)(2).  To make out this claim, Plaintiff must show more than just one or two failures to comply.[8]  While Plaintiff  believes Nationstar's repeated failures to respond to her own written complaints are enough to prove its pattern of ignoring RESPA's requirements, Plaintiff should be entitled to bolster that showing with additional evidence to make a showing that Nationstar has a "standard or institutionalized practice of RESPA violations."  **In re Holland**, No. 04-18099-JNF, 2008 WL 4809493, *11 (Bankr. D. Mass. Oct. 30, 2008).      Ms. Prostredny's testimony will show that she sent a qualified written request on June 10, 2014, supported by documentation, including her bankruptcy discharge and a ledger of the bankruptcy's trustee's disbursement of funds to Nationstar.  Nationstar sent a boilerplate response finding no error;  since the letter asked Ms. Prostredny to send proof of payment, its "investigation" apparently did not extend to reviewing the supporting documents she had already sent in.    Nationstar's response to her second QWR, on July 9, 2014, shows that Nationstar again

---

[8]   See, e.g., **McLean v. GMAC Mortgage Corp**, 595 F. Supp. 2d 1360, 1365 (S.D. Fla. 2009), aff'd 398 F. App'x 467 (11th Cir. 2010), *citing* **In re Maxwell**, 281 B.R. 101, 123 (Bankr. D. Mass. 2002) (finding that evidence of two RESPA violations was insufficient to support a pattern or practice); **Ploog v. HomeSide Lending, Inc.,** 209 F. Supp. 2d 863, 869 (N.D. Ill. 2002) (failure to respond to qualified written requests on five occasions was sufficient to establish a pattern or practice);

failed to conduct any genuine research, relied only on its payment history, and ignored the

bankruptcy context. It was only after Ms. Postredny wrote Nationstar's CEO, mentioning her

complaints to the state's attorney general, her Congressman, and the Better Business Bureau that

Nationstar acknowledged its error and corrected it, long after the time allowed under RESPA.

Her testimony and related documents show Nationstar's failure to investigate beyond its own

flawed account records, and failure to correct obviously mistaken claims for "arrears" made on

the heels of successfully completed bankruptcy are part of a pattern of inadequate responses, and

so are relevant to May's RESPA claim.

> **b.      Postredny's Experience Is Relevant to Plaintiff's Claim for Statutory Damages for Nationstar's Frequent, Persistent Noncompliance with the FDCPA**

Plaintiff seeks statutory damages under 15 U.S.C. § 1692k for Nationstar's unfair debt

collection.  Nationstar's corporate representative has admitted that in Ms. May's case, "we

should have suspended all collection activity until the dispute was resolved … or responded to."

In determining whether to award statutory damages, the jury is to be guided by, among other

things, "the frequency and persistence of noncompliance by the debt collector, the nature of such

noncompliance, and the extent to which such noncompliance was intentional."  § 1692(k)(b)(1);

**Kobs v. Arrow Serv. Bureau, Inc.,** 134 F.3d 893, 898-99 (7th Cir. 1998)(to be considered by

jury). Ms. Postredny's testimony that Nationstar continued collection to the point of referring the

loan to foreclosure, when she had sent Nationstar proof that she was current after successfully

completing her bankruptcy plan is relevant to May's FDCPA claim.

> **c.      Postredny's Testimony is Relevant to Plaintiff's Claims for Punitive Damages Under the MMPA, FCRA, and for Nationstar's Slander of Title and Invasion of Privacy**

Prostredny's testimony is relevant to a number of factors the jury will consider on Plaintiff's claims for punitive damages under the MMPA and common law causes of action.[9] Reprehensibility is key; **Estate of Overbey v. Chad Franklin Nat'l Auto Sales N., LLC**, 361 S.W.3d 364, 372 (Mo. banc 2012); "[e] of actual harm to nonparties" (like Ms. Prostredny) "can help to show that the conduct that harmed the plaintiff also posed a substantial risk of harm to the general public, and so was particularly reprehensible." **Philip Morris USA v. Williams**, 549 U.S. 346, 355 (2007).

Another factor is whether "the conduct involved repeated actions or was an isolated incident," **Heckadon v. CFS Enterprises, Inc.**, 400 S.W.3d 372, 382 (Mo. App. 2013), as "[r]epeated instances of wrongful conduct can demonstrate that "strong medicine" is required to deter further repetition. **BMW v. N. Am., Inc. v. Gore**, 571 U.S. 559, 575-76 (1996). Repeated conduct has been interpreted to mean "evidence of other acts ... [that are] factually as well as legally similar to the plaintiff's claim." **Heckadon**, 400 S.W.3d at 383 (*internal quotation marks omitted*)(*quoting* **State Farm Mut. Auto. Ins. Co. v. Campbell**, 538 U.S. 408, 423 (2003); **Pulla v. Amoco Oil Co**., 72 F.3d 648, 660 (8th Cir. 1995)(where plaintiff failed to rebut defendant's assetion that "this was an isolated and rare incident, court must view conduct as a "one-time occurrence justifying a limited award of punitive damages.") That Prostredny experienced the same treatment almost simultaneously with Ms. May shows Nationstar's wide-ranging unfair practices, from the irresponsible and unresponsive handling of May's protests to payments being treated as trial modification payments, along with its wrongful slander of title and invasion of privacy, are not isolated incident.

---

[9] That makes the testimony relevant to Nationstar's defenses as well, as its ninth affirmative defense is that "Plaintiff's claims for punitive damages are barred as Plaintiff cannot prove with clear and convincing evidence the required mental state of Defendant to justify such an award." ((Docket No. 72, Answer and Affirmative Defenses,p. 57 ¶ 9).

Another factor is the "the harm likely to result from the defendant's conduct as well as the harm that actually occurred." **Blanks v. Fluor Corp**., 450 S.W.3d 308, 410 (Mo. Ct. App. 2014). Here again, Ms. Prostredny's testimony, explaining she was "frantic" when her loan was wrongfully referred to foreclosure is relevant to the likely emotional and practical consequences of Nationstar's conduct.

      **d.     The Prostredny Testimony Is Relevant to Nationstar's Awareness of The Harm Its Unlawful Conduct Was Causing, And Intent**

Nationstar's basic stance is that it should not be judged harshly for its mishandling of Ms. May's loan, because it was an unforeseeable combination of human errors that jumbled her accounting. Ms. Prostredny's testimony will focus the jury on the real issue -- not Nationstar's accounting errors, but its failure to correct errors once they are explicitly pointed out, and the unlawful collection, foreclosure efforts, and credit reporting that flow from that failure. That Nationstar had knowledge of multiple borrowers facing the same problem undermines its claim of ignorance and makes its unlawful conduct more reprehensible. *Cf*. **Kerr v. Vatterott Educ. Centers, Inc.**, 439 S.W.3d 802, 815 (Mo. Ct. App. 2014)(in determining reprehensibility, court notes that defendant educational center knew (prior to and after Plaintiff's claim) about affirmative misrepresentations to students who enrolled in its programs, did not resolve the issue); **McElgunn v. Cuna Mut. Ins. Soc.**, 700 F.Supp.2d 1141, 1151-52 (D.S.Dak. 2010)(court admitted under Rule 404(b) evidence of an insurance company's handling of other claims pursuant to a particular policy, and of how other insureds had responded to the denials, finding that other claims showed its "intent and awareness of its actions.").

      **e.     Prostredny's Testimony Is Relevant as it Undermines The Credibility of Nationstar's "Uniqueness" Defense**

Ms. Prostredny's testimony describes how an Assistant Vice President tried to assuage her by saying "this just doesn't happen," and assuring her he would look into ways to prevent others from enduring the failures to investigate and wrongful debt collection she (and Ms. May) had endured.  (Prostredny Depo. at 54, 77. 92).  The number of times Nationstar claims its errors are "unique" or a "fluke" undermines its credibility.  *See also* **Pulla**, *supra* (addressing importance of "isolated incident" defense).

### 2. Ms. Prostredny's Experience Is Similar In Kind And Close In Time To the Event At Issue

While the underlying accounting errors were different, the rest of the pattern (incorrect claim of default after bankruptcy, repeated written complaints with proof of payment and calls ignored with claims there was "no error," payments treated as trial payments, foreclosure started during disputed default) is identical.   The times are overlapping:  Ms. May's saga started in 2013, she filed suit to stop the foreclosure in early 2014,  and her account wasn't fully corrected until May of 2015.   Ms. Prosterdny was discharged from bankruptcy in May, 2013, and received a notice that she was over $9,000 in arrears in June, 2014.  Her account was not corrected until August of 2014.

### 3. Plaintiff Will Be Able To Prove That Nationstar Unlawfully Failed To Investigate And Demanded Amounts Not Due By A Preponderance Of The Evidence

Ms. Prostredny's testimony is backed up by her written complaints and Nationstar's dated, boilerplate responses.   There is no dispute that Nationstar in fact erred and Ms. Prostredny was in fact current, as Nationstar admitted its error in its August 13, 2014 letter to her and through its Assistant Vice President of Bankruptcy Loss Mitigation, Richard Compton.

### 4. The Prostredny Testimony Is Not Unduly Prejudicial and Rebuts the Testimony of Nationstar

There is nothing confusing, inflammatory, or unduly prejudicial about Ms. Prostredny's story. The evidence goes to Nationstar's corporate practices, not to the character or tendencies of an individual. A limiting instruction will effectively obviate any danger that the jury will award damages to compensate for Ms. Prostredny or punish Nationstar for its conduct toward her. *See* **McElgunn v. Cuna Mut. Ins. Soc**., 700 F. Supp. 2d 1141, 1152 (D.S.D. 2010)(instructions that jury should "not include in your award of damages any sum that represents damages for injuries to any person other than [plaintiff]" and defendant's out of state conduct ""may be considered only in determining whether defendant's conduct occurring in South Dakota was reprehensible, and if so, the degree of reprehensibility" sufficient).

**C.     Nationstar Should be Estopped from Arguing that Plaintiff's Written Communications Were Not Qualified Written Requests.**

May contends that she sent ten written correspondence that were Qualified Written Requests ("QWR"). Because Nationstar refused to stipulate that any of this correspondence were QWRs, Plaintiff anticipates that Nationstar will argue that some or all of the written correspondence sent by May or her counsel fail to meet the statutory definition of a qualified written request or fail to meet additional requirements added by regulations including 12 CFR 1024.35(c) (servicer may establish an address that borrower must use to submit a notice of error) and 12 CFR  1024.36(b)(same for request for information).

12 U.S.C. § 2605(e)(1)(B) defines a "Qualified Written Request" as "a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, that--**(i)** includes, or otherwise enables the servicer to identify, the name and account of the borrower; and **(ii)** includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the

servicer regarding other information sought by the borrower."  A qualified written request can be sent by the borrower or the borrower's agent.  12 U.S.C. § 2605(e)(1)(A).

Nationstar should not be permitted to argue that Ms. May's correspondence, including faxes, is not qualified written requests for two reasons.   First, Nationstar conceded that they were qualified written requests by identifying documents, including two faxes (those sent on April 9, 2013 and April 15, 2015), in response to Plaintiff's Request for Production No. 3, seeking "all 'Qualified Written Requests' (pursuant to the Real Estate Settlement Procedures Act) which you received from Plaintiff."

Second, Nationstar is equitably estopped from belatedly seeking to enforce any address requirement because Nationstar representatives, in recorded calls, directed Ms. May to send faxes, not letters to a physical address.   "The principle of estoppel declares that a party who makes a representation that misleads another person, who then reasonably relies on that representation to his detriment, may not deny that representation." **Chorosevic v. MetLife Choices**, 600 F.3d 934, 942 (8th Cir. 2010), *quoting*  **Farley v. Benefit Trust Life Ins. Co.,** 979 F.2d 653, 659 (8th Cir.1992); .**BancorpSouth Bank v. Paramont Properties, L.L.C.,** 349 S.W.3d 363, 366 (Mo. Ct. App. 2011)(elements of equitable estoppel are "(1) an admission, statement, or act inconsistent with the claim afterwards asserted and sued upon; (2) action by the other party on the faith of the admission, statement, or act; and (3) injury to such other party, resulting from allowing the first party to contradict or repudiate the admission, statement, or act").  Here, Nationstar trained its representatives and had a policy in place to instruct borrowers to fax complaints only to "Research," rather than to mail correspondence to a specific address. Nationstar should not be allowed to assert as a defense that May failed to mail her QWRs based on the request of Nationstar.

Respectfully submitted,

**HUMPHREYS WALLACE HUMPHREYS, P.C.**


By:    /s/ Luke Wallace
        David Humphreys, OBA # 12346, *Pro Hac Vice*
        Luke J. Wallace, OBA # 16070, *Pro Hac Vice*
        Paul Catalano, OBA # 22097, *Pro Hac Vice*
        9202 South Toledo Avenue
        Tulsa, Oklahoma 74137
        918-747-5300 / 918-747-5311 Facsimile

        Elizabeth S. Letcher, CA Bar No. 172986, *Pro Hac Vice*
        Law Offices of Elizabeth S. Letcher
        60 29th St, No. 221
        San Francisco, CA  94110
        415-643-4755 / 415-738-5400 Facsimile

        Robert T. Healey, Jr., MO Bar No. 34138
        Healey Law LLC
        640 Cepi Drive, Suite A
        Chesterfield, Missouri  63005
        636-563-5175 / 636-590-2882 Facsimile
        **ATTORNEYS FOR PLAINTIFF**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 27th day of October, 2015, I electronically transmitted the foregoing document to the Court Clerk using the ECF System for filing.  The Court Clerk will transmit a Notice of Electronic Filing to the following ECF registrants:

Kevin M. Abel
Amy E. Breihan
Rhiana A. Luaders
Bryan Cave LLP
One Metropolitan Square
211 N Broadway, Ste 3600
St. Louis, MO  63102

Jeffrey M. Tillotson
Lynn Tillotson Pinker & Cox LLP
2100 Ross Av, Ste 2700
Dallas, TX  75201
*Attorneys for Defendant Nationstar Mortgage LLC*

        /s/ Luke Wallace